CROWELL & THURLOW STEAMSHIP COMPANY *vs.* EUNICE B. CROWELL & others, executors, & others.

Suffolk. January 5, 1932. — October 7, 1932.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, FIELD, & LUMMUS, JJ.

*Corporation,* Officers and agents: director's liability. *Equity Pleading and Practice,* Appeal; Master: findings, inference from findings. *Negligence,* Of director of corporation. *Evidence,* Presumptions and burden of proof.

Transactions between two corporations were not invalid as a matter of law merely because the corporations had directors in common and the directors were personally interested by reason of their ownership of stock in the corporations.

In a suit in equity by the receiver of a corporation against its directors to recover for losses caused to it by reason of alleged breaches of duty by the defendants, the burden is on the plaintiff to prove bad faith or lack of sound judgment, negligence or other actionable wrong on the part of the defendants.

In such a suit in equity by the receiver of a corporation engaged in the shipping business, it appeared that the corporation was empowered by its charter to invest in the stock of other corporations, and that the defendants were also stockholders and directors of a second corporation engaged in substantially the same kind of business as the first. A master found that in 1917, 1918 and 1919, at times when the first corporation had surplus funds not needed for immediate use in its business and when the second corporation was in a sound financial

condition and highly prosperous, the defendants, as directors of the first corporation, authorized on two occasions the investment of a substantial amount of its money in stock of the second corporation and subsequently authorized the making of a large loan by the first corporation to the second corporation; that the defendants, who were men of experience in the shipping business, in view of the successful history of the second corporation, considered that the investments gave an opportunity for large profits and were reasonable business ventures and that the making of the loan was in accordance with sound business judgment; that at the times of the investments the stock of the second corporation received by the first corporation was worth the price paid for it; that the second corporation continued to be prosperous until 1920, when there was a sudden slump in the shipping business, which the defendants could not have foreseen; that it then was too late for them to dispose of the stock in the second corporation and to bring about repayment of the loan without substantial loss; and that the defendants, in making the investments and the loan, acted in good faith. The master stated in his report that he did not determine whether the defendants were negligent or failed to exercise sound judgment, since he deemed that issue immaterial. On appeal from a final decree without a report of the evidence, it was *held*, that

(1) The finding by the master as to the defendants' good faith was not inconsistent with the other facts found nor plainly wrong;

(2) It was within the power of this court to make additional findings of fact by inference from the findings reported by the master;

(3) The question, whether the defendants failed to exercise sound judgment and were negligent in regard to the investments and the loan, was a material issue;

(4) The facts found by the master did not warrant an inference that the defendants had failed to exercise sound judgment or that they were negligent.

The master in the suit in equity above described further found that, previous to the time when the first corporation made its investments in and loans to the second corporation, the defendants, as directors of the second corporation, had authorized the payment of a stock dividend by it and the acquisition by it of the assets of a concern which the defendants controlled; that the values placed by them upon the assets of the second corporation against which the dividend was issued and upon the assets of the concern were excessive; and that, although the defendants did not intentionally overvalue such assets, they placed their value at a "round sum" "without obtaining any independent appraisal or judgment," "without giving serious or reasonably careful consideration to the actual facts . . . without attempting to exercise sound judgment," and without making disclosure to the first corporation or to independent advisors in its behalf, of the facts they knew as directors of the second corporation. The master stated that, "solely as a conclusion from the facts . . . stated," the defendants, in the matters of the stock dividend and of the purchase of the concern's assets, "did not exercise good faith toward" the first corporation. *Held*, that

(1) The master's conclusion was not warranted in the circumstances, and it was inconsistent with his previous conclusion that the defendants were not guilty of a breach of their fiduciary duty to the first corporation in making the investment of its funds in and the loan to the second corporation;

(2) The fact, that the defendants made the appraisal above described at a "round sum" without a separate estimate of the value of each asset and without an independent appraisal, did not warrant the master's findings that the appraisal was made without careful consideration of the facts and without the exercise of sound judgment;

(3) A finding that the defendants were guilty of negligence toward the first corporation in regard to such appraisal was not warranted.

Upon all the findings of the master in the suit in equity above described, it was *held*, that the defendants had not been guilty of any actionable breach of their duty to the first corporation and that the bill must be dismissed.

BILL IN EQUITY, filed in the Superior Court on May 29, 1924, and afterwards amended, described in the opinion, against Eunice B. Crowell, Grace B. Crowell and Aberdeen H. Child, executors under the will of Peter H. Crowell, Stephen R. Jones, William A. McKenney, Walter D. Noyes, Lewis K. Thurlow and Edward Peirce.

The suit was referred to a master, material findings by whom appear in the opinion. Motions by the defendants, except the defendant executors, that the master be ordered to report certain rulings by him and the evidence relating thereto, were denied by *C. H. Donahue*, J. Requests for rulings of law by such five defendants were refused by *Gibbs*, J., by whose order there were entered an interlocutory decree overruling such defendants' exceptions to the master's report and confirming the report; and a final decree dismissing the bill as against the defendant executors and ordering certain payments by the remaining five defendants to the plaintiff, as described in the opinion. Such five defendants appealed from the interlocutory orders and decrees and from the final decree.

The case was argued at the bar in January, 1932, before *Rugg*, C.J., *Crosby, Wait*, & *Field*, JJ., and afterwards was submitted on briefs to all the Justices except *Donahue*, J.

*A. C. Burnham*, for the defendants.

*Lee M. Friedman*, (*P. D. Turner* with him,) for the plaintiff.

CROSBY, J. This is a suit in equity in the name of Crowell & Thurlow Steamship Company by its receiver, Paul J. Bertelsen, against five directors of the plaintiff and the executors under the will of Peter H. Crowell, deceased, who also was a director of the plaintiff company through the period covered by the transactions set forth in the bill. The plaintiff now makes no claim against the estate of Peter H. Crowell. The five remaining defendants will hereafter be referred to as the defendants.

The bill seeks to charge the defendants personally with liability for loss sustained by the plaintiff, hereinafter referred to as the Steamship Company, resulting from certain transactions between that company and the Atlantic Coast Company, hereinafter called the Atlantic Company, of which latter company the defendants were directors and also stockholders. The case was referred to a master whose report does not contain the evidence upon which his findings are based. The answer of the defendants pleaded the statute of limitations, laches and a denial of the allegations in the bill which charged them with voting as directors of the plaintiff in favor of certain investments in stock of the Atlantic Company and in favor of certain loans all because of a personal interest to be served, and also of the charge that the acts of the defendants as directors were negligent and improvident both in the making and in the retention of investments. The defendants appealed from certain orders and interlocutory decrees and from a final decree dismissing the bill against the estate of Peter H. Crowell, and ordering the appellants jointly and severally to pay to the plaintiff the sums of $200,000, $100,000, and $240,160, aggregating $540,160, plus interest from June 2, 1924, to June 9, 1931, totalling $767,027.20.

The following facts are found by the master: The Steamship Company was incorporated under the laws of Maine in 1912, its main purpose being to build, purchase or otherwise acquire sailing vessels, steamships and other vessels, and to operate and deal in the same. No question is raised but that under its charter the corporation had power to make investments of the character of those involved in the

present case. Its authorized and paid-in capital was $1,000,-000. The par value of its shares was $100, which was later reduced to $10. By the year 1916 its business was highly successful and so continued during the Great War and for about two years thereafter, but then the corporation became seriously financially embarrassed as the result of the collapse of the shipping business which began late in 1920. Its stock up to that time had been widely held by banks and persons other than the defendants.

The Atlantic Company was incorporated under the laws of Maine in 1916. Its original paid-up capital was $15,000 on an authorized capital of $100,000, the par value of a share being $100. Each of the five defendants held fifteen shares; four were original directors and one McKenney became a director on June 30, 1917, when the stockholders voted to increase the capital to $2,000,000. This company was prosperous from the beginning, and a dividend of two and one half per cent was declared for each quarter from January 31, 1917, to December 15, 1920, when for the first time it was passed. The net earnings in 1919 from the operation of vessels reached the sum of $731,-965.57. However, in November, 1920, a sudden drop in the demand for shipping of all kinds occurred, with no improvement thereafter, and later proceedings in bankruptcy were instituted, in 1924, and the creditors of the company were paid sixteen cents on the dollar. The plaintiff realized from the sale of the $300,000 note of the Atlantic Company, including interest, $59,840.

The first act of the directors of the Steamship Company of which the plaintiff complains was the investment of $250,000 of its funds in the capital stock of the Atlantic Company. At that time the defendants were directors of the Atlantic Company. As the business of the Atlantic Company was rapidly increasing and its directors believed that more capital was needed, the shareholders of the company met on June 30, 1917, and at the recommendation of the directors voted to increase the authorized capital from $100,000 to $2,000,000, and at the same meeting the following votes were passed: "VOTED: To issue

to the stockholders as of record on July 14, 1917, Fifteen Hundred (1500) shares of the capital stock of the company as a distribution of the capital of the company. VOTED: That the company issue and the Treasurer be and hereby is authorized to sell Eight Thousand (8000) of the company's stock at par." This issue of ninety-five hundred shares provided for in these votes, together with the five hundred shares then outstanding, provided for the disposition of $1,000,000 of the total increased capital of $2,000,000. When the above votes were passed the original shareholders of the Atlantic Company were its only shareholders. In accordance with these votes, after July 14, 1917, one hundred fifty shares were issued to each of these original shareholders as a stock dividend.

On July 6, 1917, the defendants, as directors of the plaintiff, authorized its treasurer to invest at his discretion in the capital stock of the Atlantic Company the sum of $250,000; at that time the defendants were not only directors of the Atlantic Company but each owned fifty shares, in all two hundred fifty shares out of a total of five hundred shares issued against a cash capital of $50,000 fully paid in, and in addition were entitled to have a proportionate share of a voted stock dividend of three additional shares for each original share, to be issued against increment in value of the original capital invested, for which stock dividend the five defendants had voted a week previously as stockholders of the Atlantic Company. The investment in the shares of the Atlantic Company was not made, however, until January 17, 1918, and in passing upon the propriety of this investment the master considered the financial history of the Atlantic Company up to that time. The Atlantic Company's stockholders, upon voting to increase the number of its shares from one thousand to twenty thousand, of which fifteen hundred were to be issued and were issued to the stockholders of record on July 14, 1917, as a stock dividend, also voted that eight thousand shares of stock be sold at par ($100).

Immediately after the defendants met on July 6 as directors of the plaintiff, they adjourned and reassembled as

directors of the Atlantic Company, with the substitution of one Hilton (in no way connected with the plaintiff) for Peter H. Crowell. As directors of the Atlantic Company all the defendants except Jones voted to purchase the schooner "Noyes," and the same directors together with Jones voted to purchase the schooner "McKenney" for Atlantic stock; a ten per cent profit was to be made on each purchase, and the defendant Thurlow was to own one eighth interest in each schooner and the other defendants a one sixty-fourth interest in each, except that it does not appear that Jones purchased any interest in the "Noyes." At this meeting it was also voted that the Atlantic Company issue seven hundred fifty shares of stock for the assets of The Townsend Marine Railway and Construction Company and assume its liabilities. All the defendants were stockholders in this company. The capital stock of the company was $50,000 divided into five hundred shares of which at the date of this vote two hundred fifty-five shares were owned or controlled by the directors and original stockholders of the Atlantic Company. The master found that this plant was a desirable one for the Atlantic Company to acquire. On July 6, 1917, the directors of the Atlantic Company voted that the schooners of the company should be managed and operated by the defendant Thurlow. The master found that this vote was passed in the exercise of good faith and sound judgment. On July 18, 1917, the directors of the Atlantic Company voted to purchase two schooners then under construction for prices which were found not to be excessive although the defendant Thurlow received a ten per cent profit on the purchase price. Although the defendants as directors of the plaintiff had voted and allowed $250,000 of its funds to be invested in the stock of a corporation in which they were interested as shareholders, it appears that the Atlantic Company had paid regular quarterly dividends of two and one half per cent in September and December, 1917. One schooner was in operation and several others were under construction and were expected to be in commission during the coming year. The defendants all believed that the

Atlantic Company would soon have in most profitable operation a large fleet of schooners. The master found that this belief was warranted. The net earnings for 1917, without allowance for depreciation, had amounted to $76,971.09. The capital structure of the Atlantic Company was five hundred shares issued for cash, fifteen hundred shares issued as the stock dividend, and four thousand shares issued since June 30, to some extent apparently for cash but as to the greater portion for property including two schooners and the Townsend Company plant. Finally in respect to the important comparison of the ratio of the defendants' holdings in the plaintiff and their holdings in the Atlantic Company, the master found that all the defendants had substantial investments in both companies, and in the case of all except the defendant Thurlow these investments represented a relatively greater interest in the plaintiff than in the Atlantic Company. Thurlow and his family held slightly over eight per cent of the Atlantic Company's stock as against seven per cent of the plaintiff's stock. The time as of which the comparison was made was apparently January 17, 1918, the date of the defendants' first investment. The plaintiff alleges that the defendants in disregard of their duty and for the purpose of safeguarding their investment in the Atlantic Company took the plaintiff's funds for investment in the Atlantic stock.

It is settled that corporate funds can be used only for corporate purposes. *American Agricultural Chemical Co. of Massachusetts* v. *Robertson*, 273 Mass. 66, 83, and cases cited. In form this transaction was the use of corporate funds for corporate purposes as the plaintiff had power under its charter to invest in the stock of other corporations. It is a possible view of the evidence that the defendants voted to purchase the shares in the Atlantic Company ostensibly as an investment of the plaintiff's funds, but that their real intent and purpose were not as an investment for the plaintiff but for the purpose of assisting the Atlantic Company in expanding and increasing its business so that their shares in that company would be more valuable. If that was their intention, it would be an improper use of the plaintiff's

assets for which they would be answerable. It thus becomes important to determine the motive which actuated the defendants in voting to invest $250,000 of the plaintiff's money in stock of the Atlantic Company.

The master who saw the witnesses and heard their testimony was in a better position to judge of the purpose of the defendants in making this investment than we can possibly be with only the printed record before us. In the master's summary of his findings under the heading "Conclusions" he states in paragraph 4 that "Upon the first of these issues I am convinced by a careful consideration of all the evidence before me, that all the defendants in voting to invest the funds of the Steamship Company in the Atlantic Company in the three instances of which complaint is made, and in their subsequent action with reference to these investments, were acting in good faith and in accordance with what they deemed to be both for the interests of the Steamship Company and a proper and a reasonable use of its funds. They had made a success of the Steamship Company and believed that they could make a like success of the Atlantic Company in a somewhat different field where they considered that there was abundant opportunity for large profits. Bankers and business men in general agreed with them. Few if any shipping men or bankers seem to have foreseen the disaster which overtook all business in shipping in and after 1921. The defendants were enthusiastic to assist in reëstablishing and developing an American Merchant Marine, a project which had long been in the minds of shipping men upon this seaboard. The Steamship Company had a large surplus and funds not immediately needed in its business. It was a reasonable business venture for it to invest a portion of these funds in the construction and operation of sailing vessels. It was anticipated by all persons concerned that as the proposed fleet of the Atlantic Company was completed and put into operation the stock would prove a very profitable investment and its loans would be rapidly paid off out of earnings. This had been precisely what had happened in the Steamship Company."

The evidence is not reported and therefore the findings of the master are final and will not be reversed unless mutually inconsistent or plainly wrong. *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 139. *Anglim* v. *Brockton*, 278 Mass. 90, 94. It cannot be said that the finding of good faith by the master is obviously incorrect or·that it is so inconsistent with the other findings as to the financial transactions as to be plainly wrong. We are of opinion that the good faith of the defendants is not inconsistent with the investment of the plaintiff's funds in stock of the Atlantic Company in January, 1918. It is consistent with the facts as shown by the financial standing and business prospects of the two corporations as set forth in the master's report. The case is plainly distinguishable from *American Agricultural Chemical Co. of Massachusetts* v. *Robertson*, 273 Mass. 66. In the case at bar the plaintiff received full value for its money, as it was found that the stock so purchased was worth the price paid for it. It could have been found that it was a desirable investment and that the defendants as directors could properly seek to invest its funds in a business similar to that of their own corporation, with which business they were familiar and with which Thurlow and Crowell as officers of the plaintiff were thoroughly familiar and which Thurlow was well qualified to manage. It is to be observed that the plaintiff did not object to the findings of the master, although the burden of proof in a suit brought by a corporation against its officers is on the plaintiff to show mismanagement or misappropriation of corporate funds. *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302. *Columbian Insecticide Co. of Boston* v. *Driscoll*, 271 Mass. 74.

The second investment of $100,000 in stock of the Atlantic corporation under a vote of the defendants was made November 20, 1918. The same amount had been previously lent by vote of the defendants to the Atlantic Company. This purchase of stock was paid for by cancelling a note of the Atlantic Company. The note was guaranteed personally by the defendants Thurlow, Jones, Peirce and Noyes and another director of the Atlantic

Company. These defendants thus relieved themselves from personal liability on the note, but the master found that this transaction is to be treated on the same footing as if it had been an original subscription of this amount, since in the previous October the Atlantic Company needed funds for construction purposes and contemplated an issuance of stock but did not want to delay the receipt of funds until the necessary approval of the price by the capital issues committee of the Federal government could be obtained. This approval was in fact so obtained about November of that year. The plaintiff made no objection to this finding, and there seems to be no reason why it should not stand. The net earnings of the plaintiff in 1917 before the payment of Federal taxes were $994,487, and $2,671,481 in 1918. It thus appears that the plaintiff had a surplus of funds for investment. Except for the increase in market value of the stock of the Atlantic Company as appeared from quotations through brokers' offices, and the substantial progress made in the construction and operation of the fleet of sailing vessels, the conditions respecting this transaction were substantially the same as those surrounding the first subscription made by the plaintiff to the stock of the Atlantic Company. The same persons represented the companies in this transaction as in the first one, and "The belief of all parties to the transaction that the operations of the Atlantic Company were to become very successful and that an investment was a wise one for the Steamship Company to make still persisted. That belief had in fact become stronger as a result of the progress of the company's construction program and the earnings which were being made by the schooners already in commission."

The third act respecting which the plaintiff complains was a loan of $300,000 which the defendants made on November 19, 1919, on its demand note and secured by twenty-five hundred shares of the Atlantic Company's own stock then unissued, together with eleven hundred fifty shares of stock of the Steamship Company which were found to be worth about $100,000. The master found

that at this time the Atlantic Company needed funds for the completion of the five schooners which it still had under construction; that it also desired to pay a dividend of two and one half per cent in December which had been fully earned. For these purposes the company required additional cash at this time. Its credit at the banks was good and it undoubtedly then could have borrowed from that source at least $100,000 and perhaps more. But the directors deemed it wiser to obtain necessary funds from some other source, if possible, so as to have their line of credit at the banks in reserve for later use. "At this time the financial position of the Steamship Company was particularly strong. On November 1, 1919, it had cash on hand in the sum of $472,949.69. . . . Its books showed a surplus of assets over liabilities to the amount of $2,332,-085.61 and in addition a reserve for war risk insurance in the sum of $1,277,182.50. This was in reality an additional surplus, since the war was over and no liability had occurred against this fund . . . . Under these conditions the defendants as directors of the Steamship Company deemed it to be in accordance with sound business judgment to make this loan from the funds of the Steamship Company for which it did not have immediate use in its business in order to assist the Atlantic Company in which the Steamship Company had a $300,000 stock investment to complete its construction program, and to get its entire fleet into prompt operation." There was evidence that in the transactions of the Atlantic Company by which stock was issued for vessels and other property such vessels and property were taken at a fair market price (except in a case later to be referred to) and that the transactions were entered into in good faith. The master finds that there was no evidence to the contrary.

After June 18, 1919, pursuant to the votes of the directors and shareholders of the Atlantic Company to increase its capital from $2,000,000 to $3,000,000, $2,500,000 was issued and $500,000 was still unissued. By October, 1919, the loans of the company for construction purposes amounted to $545,000; its paid-in surplus resulting from the stock

issued for more than par was $127,470, and its other surplus as shown on its books was approximately $600,000. It then had seventeen schooners in commission and an additional schooner went into commission November 15, 1919. The total income of the company in 1919 after charging off depreciation and the payment of all expenses was over $521,000. Although the war was over, business in shipping was very active and "it was generally believed by men familiar with the business that rates would continue high and that profits would be large for some time to come." At this time it does not appear that the number of shares of stock held by the defendants Peirce, McKenney and Jones of the Atlantic Company had increased. Noyes had a claim in excess of $12,000 owed him for lumber sold and used in the construction of schooners. He accepted stock of the company at $125 a share in payment of such indebtedness to that amount. The defendant Thurlow at different times took stock in the Atlantic Company for property. The company owed him $152,519.04 for advances made in the operation of vessels and for cash advanced by him in the construction of vessels then being built by the Atlantic Company, and for expenses actually paid by him in connection with his operation of schooners of the company. The master states: "Under all the circumstances I am unable from these payments to draw the conclusion that the loan of the funds of the Steamship Company to the Atlantic Company was then made by the defendants in bad faith or in violation of any duty on their part to the stockholders of that company."

As to the loan of $300,000 by the defendants to the Atlantic Company the master states: "Nor can I draw any such inference of bad faith from the nature of the collateral accepted as security for this note. I agree that the use of the twenty-five hundred shares of unissued stock of the Atlantic Company was a rather stupid performance. Not having been issued, it had no value, and in any event being stock in the debtor company, it represented a claim against the assets of that company inferior to that represented by the note which it was to secure. So far as appears

no special consideration was given to the matter of taking security for this loan. The defendants determined that making of a loan of $300,000 to the Atlantic Company, under all the circumstances, was a reasonable business use of available funds of the Steamship Company. They had no doubt of the ability of the Atlantic Company to pay that loan with interest out of its earnings when it had completed its construction program. The matter of security for the loan seems to have been regarded of secondary importance. The shares of the Steamship Company owned by the Atlantic Company were readily available for that purpose, and were taken, furnishing security to the amount of their then value, namely, approximately $100,000. As an attempt at a further precaution twenty-five hundred shares of the Atlantic Company were issued and taken without having in mind that they would have no value until they had been paid for. Probably this was done with some notion that the remaining authorized capital of the Atlantic Company would shortly be issued and that, when these shares were thus issued and paid for, some benefit would accrue to the Steamship Company from holding them. If the contrary be assumed, the only result is that this loan was unsecured to the extent of about $200,000. The evidence indicates that the defendants regarded the credit of the Atlantic Company as sufficient to warrant an unsecured loan of this amount. In reaching that conclusion they were following the course adopted by at least one large national bank in Boston which at about this time had outstanding unsecured loans to the Atlantic Company to the sum of $400,000. I am unable to draw the inference that this loan was not made in good faith from the facts relating to the collateral taken as security for it."

The master did not determine whether in making the investments the defendants as directors of the Steamship Company failed to exercise sound judgment. He states that it was not contended by the plaintiff that ordinary negligence of the defendants would subject them to liability; that he regards that issue as immaterial. "Solely as a conclusion from the facts and findings stated by me, I find that

the defendants . . . in their acts and votes relating to this stock dividend declared by the Atlantic Company and to the purchase of the assets of the Townsend Company by it did not exercise good faith toward the Steamship Company . . . . The shares in the Atlantic Company received by the defendants and their associates . . . in connection with the stock dividend of June 30, 1917, and as the purchase price of the assets of the Townsend Company, by reason of the proposed subscriptions at par and the prospects of further earnings of the Atlantic Company, I find in fact at the time of their receipt to have been worth their par value. The result therefore is that the defendants, Thurlow, Noyes, Peirce, McKenney and Jones, and their associates in the Atlantic Company then made a total unwarranted profit of $93,660 from the stock dividend, and that these defendants and the other stockholders of the Townsend Company then made an unwarranted profit of $25,000 in connection with the purchase of the assets of that company or a total of $118,660. No part of this profit was, however, ever actually realized by these defendants or any of them in cash, for, as I have already pointed out, none of them ever made any actual profit in cash from any holdings of this stock. They did however receive this profit in stock actually worth this amount at the time and until December, 1920, regularly received dividends upon the same at the rate of ten per cent per annum. I assume but without so ruling that this is a profit which the defendants could be required to account for and pay over to the Atlantic Company upon a bill brought by that company or in its behalf by one or more of its stockholders. I am aware that ordinarily the right to recover such a profit would constitute a cause of action only on the part of the Atlantic Company. I have, however, considered and reported the facts relating to these matters in the case at bar because of the close connection of the two transactions out of which this profit arose with the subscriptions by the Steamship Company to stock in the Atlantic Company and because of the fact that the defendants in question were also directors of the Steamship Company and thus owed to that company

as well as to the Atlantic Company a fiduciary duty to exercise good faith in their conduct of its affairs."

It is found that the stock of the Atlantic Company was worth the price paid for it by the Steamship Company when it was acquired by that company, but if the defendants had not authorized the profit of $118,660 by issuing this stock to themselves and to the other stockholders, the proportionate assets of the Atlantic Company represented by each share of its stock would have been larger at the time of each issue to the company. "This increase in value would of course have enured to the benefit of all shareholders in that company then owning or thereafter acquiring its stock. Immediately after the first issue of stock to the Steamship Company it owned twenty-five hundred shares out of a total of eighty-five hundred shares then outstanding, and immediately after the second issue it owned three thousand shares out of a total of twelve thousand shares then outstanding. When the Atlantic Company was liquidated the Steamship Company owned three thousand shares out of a total of thirty thousand shares then outstanding."

It is obvious from these findings that the defendants felt that the investment of the surplus funds of the plaintiff in the purchase of the stock in the Atlantic Company and the loan to it would be a safe and sound investment and would strengthen the plaintiff's investment in the stock of the Atlantic Company. The master reviewed the subsequent history of the two companies, and his findings are consistent with his conclusion that no inference of bad faith on the part of the defendants can properly be drawn from that history. If the bill can be construed as charging negligence on the part of the defendants in the investments made and in thereafter retaining them, we are of opinion that no inference of negligence on the part of the defendants can properly be drawn although the master expressly states that he did not regard that issue as material and did not pass upon it. As to this statement, it does not appear that the plaintiff made any objection to it. It is settled that it is within the power of this court to make additional or different findings of fact

by inference from the other facts reported by the master. *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, and cases cited at page 139. It was said in *Abbot* v. *Waltham Watch Co.* 260 Mass. 81, at page 96, that the directors "cannot unlawfully divert the proceeds of its capital or other assets. . . . But they are not responsible for mere errors of judgment in the conduct of its business." *United Zinc Co.* v. *Harwood*, 216 Mass. 474, 476. *Beaudette* v. *Graham*, 267 Mass. 7, 12. *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117.

The burden rests upon the plaintiff in the case at bar to prove bad faith or lack of sound judgment, negligence or other actionable wrong on the part of these defendants. *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302. *Calkins* v. *Wire Hardware Co.* 267 Mass. 52. *Columbian Insecticide Co. of Boston* v. *Driscoll*, 271 Mass. 74, and cases cited at page 78. Most of the cases where mismanagement and misappropriation of funds were charged were cases where express trustees or fiduciaries other than directors were involved.

Although the master does not determine the questions whether in making the investments the defendants failed to exercise sound judgment and were negligent, we are of opinion that they were material issues to be determined. But upon the entire findings it is plain that the plaintiff has failed to sustain the burden of proving either. In this connection the master states that it is not contended by the plaintiff that "ordinary negligence on their part would subject them to liability in this case." We understand that apart from negligence the plaintiff contends that in making the three investments complained of the defendants acted in bad faith and failed to exercise sound judgment and reasonable and prudent discretion. We are of opinion that, in view of the financial history of these two companies as outlined by the master in detail, a finding would not be warranted that the defendants in making the investments of the plaintiff's funds in the Atlantic Company acted in bad faith or failed to exercise sound judgment. Nor does it appear that they acted in

bad faith or with lack of sound judgment in failing to dispose of the stock of the Atlantic Company and collect the loans while that company was solvent. We are unable to find that the losses which the plaintiff sustained were due to negligence of the defendants. It appears that from the date of the organization of the Atlantic Company in 1916 until the abrupt, unexpected and disastrous falling off in the demand for shipping of all kinds in the fall of 1920 this company had been financially successful. So far as appears neither the defendants nor the Atlantic Company could have foreseen or prevented the change which suddenly confronted the defendants. A testamentary trustee is not bound to forecast the sudden drop in the price of stock which he holds in a fiduciary capacity. It is a possible risk which he does not assume. *Creed* v. *McAleer,* 275 Mass. 353. That principle is applicable to the facts in the present case. The defendants were warranted in believing that the investments in the Atlantic Company were safe and could be profitably used in the highly successful business of that company. It is stated in the report that "The plaintiff has criticized the defendants for not selling the shares of stock in the Atlantic Company held by the Steamship Company and for not bringing about a payment by the Atlantic Company of its loan to the Steamship Company before the situation developed so far that such action became impossible. Up to the latter part of 1920 they deemed the stock of the Atlantic Company a sound business investment for the Steamship Company. Except in connection with large issues of new stock, the price of the Atlantic Company stock kept up to $125 a share or more. The last offer of new stock resulted in a substantial oversubscription, many of the subscribers being Boston bankers, men familiar with the shipping industry and persons who were also shareholders in the Steamship Company. Neither the defendants nor other investors in securities of this character seemed to have foreseen the slump of December, 1920, and under all the circumstances the defendants deemed it to be sound business judgment for the Steamship Company to continue to hold these

shares. When the slump came it was too late to realize upon them without a substantial loss. Even then the defendants felt that the adverse conditions would be temporary only, and expected to see the shares come back to substantially their old market value. When they did realize that a substantial loss was likely to result, it was then too late to sell this stock."

The history of the Atlantic Company subsequent to the sudden falling off of its business in 1920 will not warrant a finding that the defendants failed to perform any fiduciary duty which they owed the plaintiff or that they should have quickly sold the Atlantic Company stock and demanded payment of the note and made sale of the stock as collateral. It is held that transactions between corporations having directors in common, and in which the directors are personally interested, are not invalid as matter of law. *Union Pacific Railroad* v. *Credit Mobilier*, 135 Mass. 367, 377. *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 91. *Geddes* v. *Anaconda Copper Mining Co.* 254 U. S. 590, 599. Hence the defendants are not in the position of having paid out money in pursuance of acts which were null and void and upon which a liability may be predicated.

The master after dealing at length with the questions presented summarizes his findings in the following statement: "From the foregoing findings it seems to follow that the defendants did not commit any breach of their fiduciary duty to the Steamship Company in determining to make from its funds investments of this character and amount in the Atlantic Company. It does not follow, however, that they were warranted in making the investments in the stock of the Atlantic Company in the precise manner in which they were made or that they obtained for the Steamship Company the full proportionate interest in the Atlantic Company which under all the circumstances it was entitled to receive for the money which it paid. Upon this issue the facts relating to the stock which they and their associates received as a stock dividend and in payment for property sold to the Atlantic Company just

prior to the subscription to stock at par by the Steamship Company have an important bearing."

In determining whether the defendants failed to exercise good faith in valuing the property against which the stock dividend was declared by the Atlantic Company, and in purchasing the assets of the Townsend Company for the sum of $75,000 for which Atlantic stock was to be issued, it is to be noted that both transactions occurred prior to the time the first investment in Atlantic stock was made, and that the stock dividend vote was passed a week prior to the time of the votes of the directors to make such an investment. The master found that the defendants as directors had overvalued such property "not intentionally" but "without giving serious or reasonably careful consideration to the actual facts and without attempting to exercise sound judgment." "Solely as a conclusion from the facts and findings stated" he found that "the defendants, other than Captain Crowell, in their acts and votes relating to this stock dividend declared . . . and to the purchase of the assets of the Townsend Company by it did not exercise good faith toward the Steamship Company," the result being that the defendants and their Atlantic associates "made a total unwarranted profit of $93,660 from the stock dividend, and that these defendants and the other stockholders of the Townsend Company then made an unwarranted profit of $25,000 in connection with the purchase of the assets of that company"; that "No part of this profit was, however, ever actually realized . . . in cash . . . . They did however receive this profit in stock actually worth this amount at the time and until December, 1920, regularly received dividends upon the same at the rate of ten per cent per annum." The master further found as follows: the increase in value of the assets of the Atlantic Company of $150,000, adopted as the basis of the stock dividend of June 30, 1917, was justified only to the extent of $56,340. It was "unwarranted to its full extent by the actual value of the property"; the "defendants did not intentionally overvalue these assets. Some increase in value was justified and the directors . . .

without obtaining any independent appraisal or judgment appear to have adopted $150,000 as a round sum largely at Thurlow's suggestion without giving serious or reasonably careful consideration to the actual facts and without attempting to exercise sound judgment. Similarly when on July 6, 1917, they purchased for $75,000 in stock of the Atlantic Company at par the assets of the Townsend Company which they controlled, they did not attempt to give any serious or reasonably careful consideration to the actual value of the assets of that company. They and their associates had recently acquired more than half of its stock on the basis of a value of $50,000 for all its assets. If these assets were worth substantially more than that amount the evidence does not disclose it. In this transaction also they did not intentionally overvalue, but they did not with reasonable care consider the facts or seriously attempt to exercise sound judgment as to the value of this property. They again adopted a round sum and gave themselves and their associates the benefit of all doubts." The master states that "It is obvious however that an accounting by these defendants to the Atlantic Company for this profit would not have saved that company from bankruptcy or to any extent have given any value to its stock at its liquidation. It would merely have increased somewhat the assets which were available for the payment of a dividend in bankruptcy to its creditors. . . . Nor can I find that, if this profit had not been taken by these defendants or if they had promptly accounted to the Atlantic Company therefor, the market value of the shares owned by the Steamship Company in the Atlantic Company would at any time during the life of that company have been materially increased. That market value was largely determined by the earnings of the Atlantic Company at the period in question, the dividends which it was paying and its prospects of future success."

It appears from the master's findings that the defendants were men of mature age, with large experience in dealing with business corporations; that four of them were familiar with the shipping industry, and had frequently made invest-

ments therein; that the defendant Thurlow had had a wide experience in the shipping business for about thirty-five years both in the construction and in the operation of steam and sailing vessels; that all the defendants except Captain Crowell were directors of the Steamship Company from before 1916 until the appointment of the receiver; that when the vote declaring the stock dividend was passed and thereafter, the defendant Thurlow was a thoroughly competent and successful ship broker and agent of wide experience and handled a large fleet of sailing vessels and steamships including those of the Steamship Company, of which he was treasurer and manager; that the defendant Noyes, who was in the wholesale lumber business, was president of the Atlantic Company and had expert knowledge of the value of the assets of that company particularly of lumber which constituted a large part of the cost of its sailing vessels.

The issuance of the stock dividend was based upon an increase in value of the following items: one hundred fifteen shares of stock of the Steamship Company $4,775, schooner "Jessie G. Noyes" $45,000, fifteen vessels under construction $17,725, lumber and material at Thomaston plant $47,275, plant at Thomaston $35,225, making a total of $150,000. The master found that the increases in value adopted as the basis of the stock dividend vote were justi-fied only to the following extent: one hundred fifteen shares of Steamship Company $4,775, parts of fifteen schooners $17,725, schooner "Jessie G. Noyes" $22,840, Thomaston plant $11,000, a total of $56,340. It thus appears that the master found the increase in value of the schooner "Jessie G. Noyes" was excessive to the amount of $22,160, that the increase in value of the Thomaston plant was excessive to the amount of $24,225. As to the lumber and materials at Thomaston the master states that the defendants have not sustained the burden of showing that there was justification for any increase in value to the extent of $47,275; he therefore does not find that there was any increase under this item.

The defendants made no profit out of the Atlantic Com-

pany by making the overvaluation of its assets except such profit as accrued to all the stockholders of that company. The plaintiff contends that the defendants are liable because they committed a wrong against the Atlantic Company, and that the plaintiff can recover for that wrong, although the defendants acted in the utmost good faith toward the plaintiff as well as toward the Atlantic Company in buying stock in the latter which was worth all that was paid for it. This purchase of stock, twenty-five hundred shares for $250,000, was made on January 17, 1918. This was after the Atlantic Company acting through its directors, who are the defendants, had issued the stock dividend and bought the Townsend Company property. In April, 1918, the plaintiff sold five hundred of those shares at about $125 a share. In May, June and July, 1919, the shares were selling at from $126.50 to $135 per share. In April, 1920, a new issue of five thousand shares of the Atlantic Company was oversubscribed. The slump came in November and December, 1920, and until then the "conditions remained satisfactory." Apparently during all this time, except "in connection with large issues of new stock, the price of the Atlantic Company stock kept up to $125 a share or more." In November, 1918, the plaintiff subscribed for one thousand additional shares of the Atlantic Company at par. When that company was liquidated the plaintiff owned three thousand out of a total of thirty thousand shares then outstanding. The present suit seeks to hold the defendants as its directors liable for these investments. There is no direct finding that the defendants did not act in good faith, or did not exercise good judgment in making for the plaintiff investments in stock of the Atlantic Company. The findings are that the defendants, as directors of the Atlantic Company, did not intentionally overvalue its assets for the purpose of issuing stock; that they did not in that particular exercise reasonable care or sound judgment; that they did not make disclosure to the plaintiff, or to independent advisors in its behalf, of the facts they knew as directors of the Atlantic Company. These findings are not equivalent to a finding that the defendants acted in bad faith, or

failed to conform to their duties as directors of the Steamship Company. Such conclusions would be inconsistent with the express finding hereinbefore quoted that the "defendants did not commit any breach of their fiduciary duty to" the plaintiff in determining to make investments of its funds to the amount involved in stock of the Atlantic Company. The master then proceeds to draw the inference, solely as a conclusion from the facts found, that the defendants did not exercise good faith toward the plaintiff. It is plain that where there was in truth no lack of good faith, the inference of bad faith cannot be drawn from the circumstances disclosed. The case at bar is quite different in this particular from *General Rubber Co.* v. *Benedict,* 215 N. Y. 18, and *Matter of Auditore,* 249 N. Y. 335. The conclusion that the defendants have committed no actionable wrong is supported in principle by *Lyman* v. *Bonney,* 118 Mass. 222, *New England Trust Co.* v. *Abbott,* 162 Mass. 148, *Fillebrown* v. *Hayward,* 190 Mass. 472, 475, 477–478, *Stringer's Case,* L. R. 4 Ch. 475, 488, 492, *In re Forest of Dean Coal Mining Co.* 10 Ch. D. 450, 452, 454, 456, *Dovey* v. *Cory,* [1901] A. C. 477, 485, 489, 490, *Briggs* v. *Spaulding,* 141 U. S. 132, 148–151.

Upon the foregoing findings relating to the increase in valuation of the assets of the Atlantic Company and the purchase for $75,000 of the assets of the Townsend Company, the question for this court to decide is whether the conclusion of the master is warranted that in these two transactions the defendants did not act in good faith. The fact that the various items which totalled an increase of $150,000 in the assets of the Atlantic Company were not separately estimated but were considered as a round sum, or the circumstance that an independent appraisal was not caused to be made by persons other than the officers of the company, would not warrant a finding that the defendants as officers of the corporation failed to exercise good faith. The master expressly finds that the defendants did not intentionally overvalue the assets. They were men of experience and as stockholders and directors of the plaintiff they were financially interested in both corporations.

They were familiar with the business of the Atlantic Company which at the time this dividend was declared and the appraisal made was prosperous, and, until the sudden collapse near the end of 1920, which no one could foresee, there was no indication that it would not continue to be highly successful. We find nothing in the subsidiary findings to show that in view of the successful operation of the Atlantic Company its assets were valued at sums in excess of their real worth. There is nothing in the findings to show that because they made the appraisal of the various items at a "round sum" they failed to give "serious or reasonably careful consideration to the actual facts and . . . [did not attempt] to exercise sound judgment." There is no finding that they were negligent in the performance of this duty they owed the plaintiff corporation, and none can properly be inferred from the findings. On the other hand the master found that the stock of the Atlantic Company was worth the price paid for it by the Steamship Company when it was acquired.

It was held in *Lyman* v. *Bonney*, 118 Mass. 222, where the directors of a corporation were charged with the misapplication of its funds and the master found that the directors did not exercise proper care, that these findings "do not support the allegations necessary to maintain the bill . . . . They [the directors] are not responsible for mere errors of judgment or want of prudence in conducting or closing up its business." *Fillebrown* v. *Hayward*, 190 Mass. 472, 475, 477–478. *Abbot* v. *Waltham Watch Co.* 260 Mass. 81, 96. *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117. In view of the subsidiary findings of the master, we are of opinion that the ultimate findings that the defendants as directors of the Atlantic Company failed to give careful consideration to the facts, that they did not exercise sound judgment, and did not exercise good faith in valuing the assets of the Atlantic Company and in purchasing the assets of the Townsend Company cannot properly be sustained. It is plain from the findings relating to the investment of funds of the Steamship Company to the amount of $250,000 in stock of the Atlantic Company, the loan of

$100,000 of the funds of the Steamship Company to the Atlantic Company and repayment by the acceptance of stock in the Atlantic Company, and the loan of $300,000 of the funds of the Steamship Company to the Atlantic Company, that the defendants cannot properly be held liable for any breach of duty.

It results that the final decree must be reversed and a decree entered dismissing the bill with costs.

*Ordered accordingly.*