JOHN J. MURPHY, trustee, *vs.* G. B. HANLON & others, trustees, & others.

Suffolk.    January 6, 1948. — May 7, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, RONAN, & WILLIAMS, JJ.

*Corporation,* Officers and agents, Purchase by corporation of its own stock. *Equity Pleading and Practice,* Findings by judge, Appeal. *Evidence,* Presumptions and burden of proof.

Findings by a judge in a suit in equity merely stating conclusions contrary to the basic charges in the bill and that the plaintiff had failed to prove the bill's averments, where the evidence was fully reported and consisted not only of exhibits and depositions of nonresident witnesses but also of important oral testimony, must stand unless, giving to the oral testimony all the weight the judge could justifiably have given it, such findings were plainly wrong.

In a suit in equity by a business corporation against an investment trust for rescission of an exchange of securities owned by the plaintiff for shares of the plaintiff's stock owned by the defendant, where it appeared that officers of the plaintiff participating in the exchange were also officers of the defendant or connected with a partnership "allied" with the defendant, the standard of duty to the plaintiff by which the conduct of such common officers should be tested was no higher than would be applicable in a proceeding by the plaintiff against them personally, namely, that they were required to act in good faith and

with reasonable intelligence, but were not chargeable for mere errors of judgment.

The burden was upon the plaintiff of proving the allegations of a bill in equity by a business corporation against an investment trust seeking rescission of an exchange of securities on the alleged grounds of fraud, lack of good faith and breach of fiduciary duty on the part of officers of the plaintiff who also were officers of the defendant or members or employees of a partnership "allied" with the defendant.

On an appeal from a decree dismissing a suit in equity seeking rescission of an exchange of a certain security owned by the plaintiff, a corporation, for shares of its own stock owned by the defendant, an investment trust, on the alleged grounds of fraud, lack of good faith and breach of fiduciary duty on the part of officers of the plaintiff who also were officers of the defendant or members or employees of a partnership "allied" with the defendant, where the evidence was fully reported and consisted of exhibits, depositions of nonresident witnesses and important oral testimony, findings by the trial judge which consisted merely of categorical statements that the plaintiff had failed to prove the allegations of the bill, that the common officers committed no fraud on the plaintiff but exhibited good faith, and that they committed no breach of fiduciary duty, were not shown to have been plainly wrong; and the decree was affirmed.

BILL IN EQUITY, filed in the Superior Court on December 8, 1941.

The suit was heard by *Giles*, J.

*J. M. Graham*, (*C. J. Milton*, of New Jersey, & *F. J. Garvey* with him,) for the plaintiff.

*E. O. Proctor*, for the defendants.

QUA, C.J. The plaintiff in this suit is the trustee appointed by the District Court of the United States for the District of New Jersey of International Power Securities Corporation, hereinafter called International. The defendants are the trustees (now enjoined from acting in that capacity) of Aldred Investment Trust, a so-called Massachusetts trust, and the receivers of that trust appointed by the District Court of the United States for the District of Massachusetts. The object of the suit is to rescind an exchange of securities between International and the investment trust effected on November 13, 1939, before either receivership, whereby International transferred to the investment trust four thousand shares of six per cent cumulative preferred stock of Eastern Gas and Fuel Associates, hereinafter. called Eastern, and received in return two thousand

units of International's own stock. A unit consists of one share of six dollar preferred stock and one share of common stock.

The grounds on which rescission is sought are that certain officers of International who had to do with the exchange were also officers in the investment trust or were partners in, or employed by, Aldred and Company, a partnership "allied" with the investment trust; that Aldred, who was president both of International and of the investment trust, dominated the officers of both organizations; that the common officers "fraudulently and without exercising the good faith and fiduciary duty required of officers, directors and trustees, acting for two principals," brought about the exchange; and that the consideration received by International was inadequate, and the exchange was unfair and inequitable to International. We assume without deciding that if any wrong was committed against International the circumstances were such that all the defendants were chargeable with notice. The trial judge found that the plaintiff had failed to prove the allegations of the bill; that the defendants and their predecessors committed no fraud upon International but exhibited good faith; and that they committed no breach of fiduciary duty. He made no more detailed findings. He dismissed the bill. The plaintiff appeals.

The evidence is reported and is voluminous, with many lengthy exhibits. Much of it consists of depositions of nonresident witnesses, but important testimony of certain witnesses bearing upon the foregoing findings was heard orally by the trial judge. In so far as the evidence consists of depositions and exhibits we are in the same position to judge its weight as was the trial judge, but in so far as it consists of testimony which he heard orally he had the advantage of observing the witnesses in person. We can therefore reverse his findings only if we are satisfied that, giving to the oral testimony all the weight the judge could justifiably give to it, the findings are nevertheless plainly wrong. *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 407–408, and cases cited. *Malden Trust Co.* v. *Brooks,* 291 Mass. 273, 279. *Berry* v. *Kyes,* 304 Mass. 56, 57.

The standard of duty of corporate officers, where the corporation is not a banking corporation, is fully stated, with a collection of the previous decisions, in *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 410–412. In substance, it is the standard of complete good faith plus the exercise of reasonable intelligence. Such officers are not responsible for mere errors of judgment or want of prudence short of "clear and gross negligence." To the same effect see *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117; *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 438; *Baker* v. *Allen,* 292 Mass. 169, 172–173. The decision in *Lazenby* v. *Henderson,* 241 Mass. 177, cited by the plaintiff, on the facts of that case conforms to this rule. There is no reason for any stricter standard in this case, where suit is brought against the investment trust for rescission of a bargain entered into with that trust through the officers of International, than would be applied if International were suing its own officers for loss resulting from their conduct. There is no rule that such a transaction as that between International and the investment trust is fraudulent in law because two of the directors of International were also trustees of the investment trust, including Aldred, who was president of both. *Union Pacific Railroad* v. *Credit Mobilier of America,* 135 Mass. 367, 377–378. *Fillebrown* v. *Hayward,* 190 Mass. 472, 478. *Jenkins* v. *Lewis,* 244 Mass. 502. *Crowell & Thurlow Steamship Co.* v. *Crowell,* 280 Mass. 343, 361. *Foster* v. *Bowen,* 311 Mass. 359, 366–367. These circumstances are, however, to be taken into account in determining whether on all the evidence, there was fraud in fact.

Under the decisions in this Commonwealth the burden of proving the allegations of the bill is upon the plaintiff. *Von Arnim* v. *American Tube Works,* 188 Mass. 515, 516–517. *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302, 306. *Columbian Insecticide Co. of Boston* v. *Driscoll,* 271 Mass. 74, 78. *Crowell & Thurlow Steamship Co.* v. *Crowell,* 280 Mass. 343, 352. *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 412. Compare *Geddes* v. *Anaconda Copper Mining Co.* 254 U. S. 590, 599, quoted in *Lazenby* v. *Henderson,* 241 Mass. 177, 180, and in *Buckman* v. *Elm Hill Realty*

*Co. of Peabody,* 312 Mass. 10, 15. In the *Lazenby* and *Buck-man* cases the facts had been found by a master. The quotation in these cases from the *Geddes* case must be deemed to have been inserted for its bearing upon the fiduciary obligations of interlocking directors and not as changing the rule as to the burden of proof established in this Commonwealth by our own decisions. See collection of cases in 114 A. L. R. at pages 311–314, showing the positions on this point taken in different jurisdictions.

We have examined the entire evidence to determine whether, in our opinion, the judge's findings that the plaintiff has failed to sustain the burden of proving bad faith or breach of fiduciary duty on the part of the officers of International are plainly wrong. We think they are not plainly wrong.

On November 13, 1939, when the exchange was made, International was a holding company. Its balance sheet as of September 30 showed assets of $25,686,175.12. Of this total $19,069,533.83 consisted of first mortgages on certain power plants and other properties in Italy, which were pledged to secure issues of International's own bonds in amounts equal to the face values of the mortgages. International's other assets consisted principally of other securities held by it, some of which were pledged to secure bank loans, which then aggregated in the neighborhood of $1,000,-000. Its liabilities, in addition to its bonds and bank loans, consisted principally of a reserve for taxes, and of its six dollar cumulative preferred and common stocks, of which it held more than a quarter in its own treasury. Its balance sheet showed a capital surplus of $1,261,161.45. Its ten directors were nearly all men of experience and prominence in the business and financial world. Eastern owned the stocks of coal, gas, and coke companies operating in West Virginia, Boston, Philadelphia and elsewhere. Its balance sheet for December 31, 1939, showed assets and deferred charges of $229,819,783.05. The exchange in question was made on the basis of $22 a share for the four thousand shares of Eastern against $44 a unit for the two thousand units of International. The total amount involved on this

basis was $88,000. International parted with less than a third of its Eastern stock, of which it held a very large block, and the investment trust still retained a· large amount of International stock and units. It would therefore have been possible to exchange a much larger quantity of these securities.

A prime consideration in determining whether there was fraud or other breach of the fiduciary obligations of International's officers in making the exchange is, of course, the market values of the respective securities, ascertained in the best manner available. The market value of the ·Eastern six per cent cumulative preferred stock was fairly definitely fixed at $22 by its quotation upon the New York Curb Exchange, where there was active trading in this stock. No such definite measure is available for the value of the International units. These were inactive "over the counter" securities, quoted only on a "bid" and "asked" basis. Their value was necessarily to a great extent a matter of opinion. In October, 1939, International had been buying in its units in small lots at prices which by November 13 had risen from $20.25 to $40.25. Between November 15 and November 28, the price range was from $43.75 to $41.75. After January 3, 1940, the purchase of small lots continued at prices generally ranging between $37 and $38, but this was after the dividend had been paid. In the latter part of April, 1940, the price went down to $30 as the war news became worse. The price of $44, at which the exchange was made, was very slightly higher than that at which any of the small lots of International units were bought in at about the same time, but the exchange was of a very large lot, and the evidence was that large lots would command a higher price. The plaintiff contends that Aldred "rigged" the market by these purchases so· as to create an apparent value of $44 for International units in order to exchange the four thousand shares of Eastern at $22 for the two thousand units of International at $44. It is true that no effort seems to have been made to trade down the prices on these small purchases. International accepted the lots at the prices at which they were offered. No doubt

Aldred was anxious to get in as many shares as he could for reasons that will appear later, and International's units were not readily obtainable. It may be that the continued small purchases over a period of time did tend to raise the asking price of so inactive a security, but we are not satisfied that there was a deliberate attempt to create a fictitious value. International had previously for a long time pursued the policy of buying in its own shares until the total number of shares outstanding had been substantially reduced. This policy had been temporarily discontinued in 1937, but had been resumed in October, 1939, all purchases being ratified by the directors. International was paying $4.50 on each unit. This would give a yield of over ten per cent on a price of $44. It is true that several of International's directors had objected to paying dividends, apparently because of the size of International's bank loans, but successful efforts were being made to reduce these loans through the sale of security holdings. It does not appear that in November, 1939, there was visible imminent danger of the discontinuance of dividends. According to book values as shown in International's reports its units were worth a great deal more than $44. Oral evidence bearing on the worth of the units was conflicting. One expert witness testified that on November 13, 1939, it would have been necessary to offer a price of $50 a unit in order to acquire a block of two thousand units. In so far as the usual indicia of market value are valid as applied to an inactive security like International's units the price of $44 does not seem greatly out of line.

The plaintiff argues with force that it was bad judgment for International to use its assets to buy in its own junior securities while it was indebted upon outstanding bonds having a prior claim upon those assets, and that the price at which the units were acquired was about the same as that being obtained on the New York Curb Exchange for International's bonds, which were obligations senior to the units and which bore a slightly higher rate of interest, which was then being paid in full. But there was evidence that the bonds appeared to be fully secured by the Italian

mortgages, and the evidence was conflicting as to the propriety of International using its assets to buy in its own junior securities. We are not sure that we have before us all the considerations which might have affected bond prices as compared to the price of the units, and there were peculiar advantages to International in acquiring its own units which are fully discussed later in this opinion.

The plaintiff also argues that the earnings of International had shown a substantial tendency to decrease in the years 1937, 1938, and 1939, while the earnings of Eastern were showing a very substantial tendency to increase in the latter part of 1939. The argument is that reasonably prudent directors would have perceived on November 13, 1939, that International was on the down grade and would continue to go down and that Eastern was on the up grade and would continue to go up. It is easy to make this argument after the outcome is known, but great care must be exercised to judge the directors' conduct in the light of conditions in November, 1939. One of the principal reasons for International's reduced earnings was that Eastern, of a large block of whose stock International was ridding itself by this exchange, had ceased to pay dividends. The Eastern stock held by International was junior to an issue by Eastern of prior preference stock. In 1937 Eastern had dropped its dividend to $3.75 a share on the type of preferred stock involved in the exchange. Eastern had had a bad year in 1938 and had paid in that year a dividend of only $1.50 a share. In 1939 it paid no dividend at all on that stock. The improvement in Eastern's earnings seems to have become fully established only late in that year as industry in general became more active. This improvement was reflected in the market quotations for Eastern's stock, which, however, did not rise very significantly until September and then dropped back slightly before November 13. The officers of International can hardly be held at fault for not rating Eastern more highly than an active market in its stock rated it. One of the trustees of the investment trust was persuaded to assent to the exchange only upon an understanding that

the Eastern stock which the trust was acquiring would be promptly sold.

But the most significant factors in the whole situation seem to us to have been the conditions brought about by war. The fall of France in the spring of 1940 was followed by the entry of Italy into the war. This in turn shut off the income of International from its very large Italian investments and must be considered the fundamental cause of International's downfall, which culminated in the appointment of the plaintiff as trustee in February, 1941. Meanwhile war preparation in this country and the industrial activity which it brought about must be considered the largest single factor in the increase of Eastern's coal, coke, and gas business. The plaintiff argues that the officers of International should have foreseen these consequences in November, 1939. We are not prepared to charge them with lack of such foresight. It is true that International had very large commitments in Italy which might be adversely affected if Italy entered the war. It is also true that by November 13, 1939, some restrictions had already been placed on the transfer of funds from Italy. But these restrictions did not prevent the regular payment of the interest on the Italian mortgages until Italy entered the war. The Italian operating companies, which included the Milan Edison Company, appear to have been large, strong, prosperous, and able and willing to meet all obligations until war prevented. They were earning their interest obligations several times over. It must be remembered that in November, 1939, Germany had overrun Poland, and the war between Germany on one side and England and France on the other side seemed to have reached a condition of stalemate — the "phony war," as it was then called. If Italy was then an ally of Germany, she had not entered the war. Who can say that she would have done so, if France had not fallen? Who could say in November, 1939, that France would fall? Who could say that if Italy entered the war the remittance to America of interest on the Italian mortgages would be stopped? And to go a step farther, who could say at that time that this country would enter the

war, to the further great acceleration of the activities of Eastern?

The desirability to International of the exchange of stocks must be viewed from another standpoint. International was paying dividends at the rate of $4.50 on its $6 cumulative preferred stock which it was acquiring by the exchange. There were arrears of unpaid dividends of $6.50 a share on that stock. As previously stated, Eastern was paying no dividends on its stock which International was transferring to the investment trust. It did not resume payments until 1941 and then only at a rate of two and one quarter and later three per cent. Through exchanging a part of its Eastern stock then worth $88,000 in the market International eased its position by relieving itself of all obligations for arrears of dividends amounting to $13,000 and of all obligations to pay dividends amounting to $12,000 in each subsequent year, on which it was then actually paying $9,000. It did this without any loss of present income and with only the risk that Eastern might at some time return to such a state of prosperity as to offset all the immediate benefits. That this did happen in war conditions after no great lapse of time does not seem to us plainly to reflect upon the good faith or seriously upon the judgment of International's officers.

It does not appear that any of these officers derived any direct personal profit from the exchange. Neither does it appear that indirectly any of them derived any benefit from it such as might have furnished an incentive to agree to it. It is true that Aldred was president both of. International and of the investment trust and that, of the eight directors of International who were not also trustees of the investment trust, two were partners in, and one was employed by, the partnership of Aldred and Company. Aldred and Company held large blocks of securities in both International and the investment trust, but it does not appear that its interest in the investment trust was of such nature that any advantage the trust might derive from the questioned exchange would affect appreciably the fortunes of Aldred and Company, and it does not appear what interests

the directors of International who were partners in Aldred and Company had in that firm. It does not appear that Aldred dominated the directors as alleged. We are not satisfied that there was any intent to conceal the true nature of the exchange from any of the directors. The exchange was not ultra vires or otherwise unlawful.

In conclusion, it seems to us that, notwithstanding some evidence tending to raise doubts, the judge was not plainly wrong in taking the view that the plaintiff had not sustained the burden of proving bad faith, and that he was not plainly wrong if he took the view that there was at most no more than an error of judgment within the area within which the officers of a corporation must be left free to decide questions of business expediency.

*Decree affirmed with costs.*