Susan E. Foster *vs.* Henry G. Bowen & others.

Essex. November 4, 1941. — April 2, 1942.

Present: Field, C.J., Donahue, Qua, Dolan, & Ronan, JJ.

*Bond,* Fidelity. *Corporation,* Officers and agents.

A bond given to a corporation to indemnify it against loss through "larceny, embezzlement, forgery, misappropriation, wrongful abstraction or any other fraudulent or dishonest act" of its employees did not cover the acts of its treasurer and director in leasing certain of its property to himself, which were found to have been "without fraudulent or dishonest intent but under a belief that they were legal and authorized" by the corporation's president.

If a fidelity bond given a corporation did not cover certain acts of an

employee, the corporation suffered no loss through failure of its president seasonably to give the bonding company a required notice of such acts.

The president of a corporation, although he believed the treasurer's leasing of certain of its property to himself was illegal, was not made liable to the corporation on the ground of fraud through subsequently purchasing the treasurer's stock in the corporation, where it appeared that he did not intend to put property of the treasurer beyond the corporation's reach so as to damage it and that he did not damage it thereby; nor for salary paid to the treasurer after the president learned of the leases, where it was paid for services most of which had no relation to the leases, and the treasurer had acted in good faith as to the leases; nor for delaying, after learning of the leases, in bringing them to the attention of the directors or otherwise failing to prevent the treasurer's deriving benefit from them, where the corporation was not shown to have suffered damage thereby.

BILL IN EQUITY, filed in the Superior Court on July 11, 1940.

By order of *Giles*, J., there were entered an interlocutory decree confirming a master's report and a final decree dismissing the bill. The plaintiff appealed.

*E. S. Farmer*, for the plaintiff.

*H. B. Holland*, for the defendant Bowen.

QUA, J. The plaintiff, a minority stockholder in the Fitchburg and Leominster Street Railway Company, brings this bill in behalf of herself and all other stockholders who desire to join therein to recover for the benefit of the street railway company losses which are claimed to have been sustained by it in consequence of alleged breaches by the defendant Bowen of his fiduciary obligations as its president and director.

The facts were found by a master.

The by-laws of the company provide that the officers shall consist of a president, vice-president, board of directors, clerk, treasurer, and manager, "which officers shall manage and conduct the business," and that the president, treasurer and manager "shall be the business agents of the company." Bowen, who was a lawyer, became president and director early in 1935. From time to time he has attended to most of the legal affairs of the company. During the times here material until March, 1938, one Cushing was the treasurer and manager. In 1935 he also became a

director.  The company owns and controls an amusement
resort known as Whalom Park.  Cushing "had charge" of
the leasing of concessions in the park, including that for a
roller skating rink.  In the year 1929 the person then hold-
ing the lease of the rink left, and thereafter Cushing made
and signed in behalf of the company a lease of the rink from
the company to himself, signing also individually as lessee.
He did this with the knowledge and approval of one Baker,
"a prominent member of the bar," who was then president
and a director and largely in control of the affairs of the
company.  Thereafter Cushing continued as lessee of the
rink under leases similarly executed, except that in 1934
the whole park was leased to one Venner, from whom Cush-
ing obtained a sublease of the rink.  The last lease executed
by Cushing as manager of the company to himself individ-
ually was dated February 27, 1935, to run for three years
from March 18.  In all the leases from the company to
himself Cushing undertook to pay the company twenty-
five per cent of the gross receipts.  Payments appear on
the books of the company, but they appear under Cushing's
name only for 1935.  In each of the years during which
Cushing held a lease, including 1934, he sublet the rink to
one Laventure, who operated it under an agreement by
which he was to pay Cushing fifty per cent of the gross
receipts (forty-five per cent in 1930).  Thus in general, sub-
ject to some items of expense, Cushing was getting fifty
per cent of the gross receipts and was to pay the company
twenty-five per cent.  Baker knew of this arrangement at
the beginning.  He knew what percentage the company
was to receive.  It does not appear that he knew the exact
percentage Laventure paid to Cushing, but he told Cushing
that it was all right for Cushing "to try to improve the
rink for the company and the little he would get would pay
for the extra time in the park."  Bowen knew nothing of
Cushing's leases to himself until January 20, 1937, when
Cushing explained the situation to him, told him how it
had come about with the original approval of Baker, the
former president, and showed him the leases.  Bowen told
Cushing "that he thought a lease from an officer of a cor-

poration to himself was illegal" but he did nothing about it, except to mention the leases to a fellow director at luncheon, until May 14, although there were four directors' meetings and a meeting of the stockholders in the meantime. At a directors' meeting on May 14, in response to a question by Bowen, Cushing brought in the then current leases, and Bowen commented that the three-year lease to Cushing was illegal. Cushing said that he had had a lease from Baker's time; that Baker knew about it; that he (Cushing) "made a few hundred dollars out of it"; that he would like to have it run for the remaining year of the term; and that he would then give it up. Bowen asked the directors what they wished to do. No one made any suggestion, and they passed on to consideration of the next business. It was not until March, 1938, that the directors, having by that time acquired further information about the leases and the amount Cushing was actually making out of the rink, and becoming dissatisfied with him for other reasons, decided that Cushing's connection with the company should be terminated. He was not reëlected director for that year, and his offices as treasurer and manager were declared vacant. Further findings will be stated in connection with the several matters hereinafter discussed.

1. The principal question is whether Bowen is liable for causing the company to lose the benefit of two fidelity bonds wherein National Surety Corporation had become bound to indemnify the company against loss of money or other personal property through improper conduct of Cushing. The first bond became effective July 1, 1927, and the second June 1, 1936. Each of these bonds required the company to notify the National Surety Corporation of any act upon which a claim might be based within a few days after its discovery and to follow this up with proofs of loss. The plaintiff contends that Bowen's failure to do this or to notify the other directors within the required time after he learned of the leases on January 20, 1937, rendered the bonds valueless. The first bond covered loss "through the fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction" of Cushing. The

second covered loss "caused by larceny, embezzlement, forgery, misappropriation, wrongful abstraction or any other fraudulent or dishonest act or acts committed by any of the Insured's employees." Bowen, on the other hand, contends that the bonds never covered the acts of Cushing here called in question, and that therefore the company lost nothing by any delay on Bowen's part in giving the necessary notices.

Doubtless the words quoted from these bonds should be construed somewhat broadly to effectuate the purpose of the bonds. The coverage is not limited to loss resulting from strictly criminal acts. But the bonds were intended as protection against dishonesty and not as security in the ordinary sense for a balance which an accounting might show to be due. There is significance in the collective use of the expressions selected to define the coverage. All of them commonly denote conduct that is consciously wrongful. Indeed, only the words "fraud," "fraudulent," and "misappropriation" seem capable of any other meaning, and these words must be defined with reference to the context in which they appear. There is to be discerned in the decided cases a tendency to construe bonds worded as these are as insuring against the consequences of conduct of the employee that is intentionally and consciously dishonest and fraudulent and as not insuring against the consequences of acts done in actual good faith without intentional fault. *Louis Pizitz Dry Goods Co.* v. *Fidelity & Deposit Co. of Maryland,* 223 Ala. 385. *Kansas Flour Mills Co.* v. *American Surety Co. of New York,* 98 Kans. 618. *Home Owned Stores, Inc.* v. *Standard Accident Ins. Co.* 256 Ky. 482. *Universal Credit Co.* v. *United States Guarantee Co.* 321 Penn. St. 209. *First National Bank of Edgewater, New Jersey* v. *National Surety Co.* 243 N. Y. 34. *World Exchange Bank* v. *Commercial Casualty Ins. Co.* 255 N. Y. 1. *Parker Lumber & Box Co.* v. *Aetna Casualty & Surety Co.* 140 Wash. 262, 269. *Humbird Cheese Co.* v. *Fristad,* 208 Wis. 283. *Fidelity & Deposit Co. of Maryland* v. *Bates,* 76 Fed. (2d) 160, 166, 167. See *Gilmour* v. *Standard Surety & Casualty Co. of New York,* 292 Mass. 205, 210. In our

opinion the bonds did not cover such acts as were in fact innocently done and were merely constructively or technically a "fraud," or "fraudulent," even though they might constitute a breach of Cushing's obligations as an officer of the company and so give rise to a cause of action against him.

On the findings of the master Cushing's acts were of this kind and were not actually dishonest or fraudulent. The master finds, "To the extent that it is a question of fact Cushing's leases of the rink to himself were not made with fraudulent or dishonest intent, but rather under a belief that the profit to accrue to him was legitimate and was authorized by his conversations with Baker." This finding is not inconsistent with the further findings that he had told the directors in May, 1937, that he "made a few hundred dollars out of it," when for the previous season his profits had been nearly $2,400 and for the year before that about $1,300, subject to some expenses which seem to have been comparatively small. In most of the years during which he had held leases his profits could have been described within reasonable limits of honesty as "a few hundred dollars." Moreover his statement to the directors was only one piece of evidence tending against him. Tending in his favor were the facts that Cushing paid openly to the cashier on account of his leases all that he was expected to pay under his original arrangement with Baker. "He did not attempt to conceal his transactions with respect to the rink but carried them out through the company office and told of them and of his own profit whenever the question was raised." The master states that he has given weight to his impressions received from observing Cushing as a witness. "He is not highly educated and is not a man who would have a very full comprehension of the meaning and effect of written documents, by-laws, corporate votes and the like." Cushing's good faith was a question of fact. The master has decided that question in favor of Cushing and Bowen. So far as we can see from merely reading the record it could have been decided the other way. But the master saw the witnesses and heard the evidence. His

subsidiary findings support his final conclusion based upon them that "Cushing's transactions with respect to skating rink rents were without fraudulent or dishonest intent but under a belief that they were legal and authorized, and therefore were not covered by either bond."

In view of what has been said it is unnecessary to consider whether the company's rights on the first bond had already been lost by Baker's knowledge and failure to notify the insurer before Bowen ever became an officer of the company. In any event the company lost nothing on either bond through Bowen's delay.

2. The plaintiff's claim that Bowen is liable for fraud in purchasing Cushing's stock in the company shortly after Cushing's connection with the company was terminated, and thereby preventing the company from recovery against Cushing, is not sustained by the master's findings. Bowen paid for the stock a price which, so far as appears, was its full value. He did not intend to put property beyond the reach of the company, and his purchase "did not in fact place Cushing's property beyond reach." These facts are not controlled by other findings and warrant the master's conclusion that "Bowen's purchase of Cushing's stock was without intent to damage the corporation and it did not in fact damage the corporation." Any subsequent attempts by Cushing to conceal his assets are not chargeable to Bowen.

3. There was no error in refusing to charge Bowen with the salary paid to Cushing after Bowen learned about Cushing's lease in January, 1937. The salary was paid for services as treasurer and manager of the company. The great bulk of these services had no relation to the leases, and in the matter of the leases Cushing is found to have acted in good faith. The salary was not paid for unfaithful work. The case is governed by what is said in *Lydia E. Pinkham Medicine Co.* v. *Gove,* 303 Mass. 1, 4–6, and in *Daniels* v. *Briggs,* 279 Mass. 87. See also *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, where officers of a corporation were allowed the fair value of their services, although they had attempted to vote themselves more, and *Shaw* v. *Harding,* 306 Mass. 441, 447.

4. The plaintiff further contends that Bowen is liable for the sums received by Cushing from his lease after Bowen's discovery of its existence on January 20, 1937. This contention is apparently within the scope of the bill, although it seems doubtful whether the claim was pressed before the master. The master does not mention it in stating the issues before him. His findings are not in form directed toward this issue. Bowen believed that Cushing's lease was illegal. But Bowen seemed to the master "to be a man who desired to do the fair thing in situations which were delicate and difficult." There is no finding of bad faith on his part. He did not profit personally through Cushing's lease. "Directors of a business corporation in the absence of positive statutory enactment are not responsible for errors of judgment . . . provided they act honestly." *Hathaway* v. *Huntley*, 284 Mass. 587, 591. *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117. *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 411, and cases cited. A somewhat higher duty may rest upon directors of a banking institution. See *Goodwin* v. *Simpson*, 292 Mass. 148, 150. Bowen's delay from January 20 to May 14 in bringing the matter of Cushing's lease before the directors, coming as it did before the summer season, may have been of no material consequence. When the directors took the matter up on May 14 a question of judgment may have been involved. There was a suggestion in the talk between Cushing and Baker that when Baker permitted Cushing to take his first lease Cushing was to perform some work in connection with it. In fact he paid for help, tickets, permits, light, heat, and, in the latter part of the period, liability insurance. He agreed with his sublessee to keep the premises in repair. It does not appear that he performed no services of value in connection with the rink. The income from the rink had greatly increased in the three years preceding May 14. There is no absolute prohibition of dealings between a corporation and its officer, if proper safeguards are observed to insure that those acting for the corporation are themselves disinterested and the utmost good faith is exercised. *Union Pacific Railroad* v. *Credit Mobilier of America*, 135 Mass.

367, 376. *Fort Payne Rolling Mill* v. *Hill*, 174 Mass. 224. *Fillebrown* v. *Hayward*, 190 Mass. 472, 478. *Jenkins* v. *Lewis*, 244 Mass. 502. *Crowell & Thurlow Steamship Co.* v. *Crowell*, 280 Mass. 343, 361. It follows that the directors other than Cushing could, for aught that appears in this record, have ratified the lease by him. *Kelley* v. *Newburyport & Amesbury Horse Railroad*, 141 Mass. 496, 499. *Nye* v. *Storer*, 168 Mass. 53, 55. So far as this record proves it may have been a reasonable exercise of judgment to take no action at that time. There is no finding to the contrary. The master finds as a conclusion from his other findings that the "corporation has suffered no damage through the acts and omissions of Henry G. Bowen." Even if this finding was not intended precisely to apply to the issue now under discussion, and even if it is not affirmatively supported by his other findings (questions which we do not decide), still we feel that the findings of the master are not such that we ourselves ought now, in the face of the difficulties just mentioned and in the absence of further findings on these points, to infer a breach of trust on Bowen's part in not doing more to prevent Cushing from receiving income from the rink through the season of 1937.

5. Since we have dealt with the plaintiff's contentions on their merits, we need not deal with Bowen's argument that the plaintiff failed to lay a sufficient foundation for the suit by efforts to induce the company to act in its own behalf.

6. The plaintiff's exceptions to the master's report do not require separate discussion. There was nothing in the case, in the view we take, which required that any of them be sustained.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs.*