# FIRST NATIONAL BANK OF SOUTHERN MARYLAND *v.* UNITED STATES FIDELITY AND GUARANTY COMPANY

\* \* \*

# UNITED STATES FIDELITY AND GUARANTY COMPANY *v.* SELLNER

[No. 110, September Term, 1974.]

*Decided June 30, 1975.*

The cause was argued before SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned.

*Kenneth E. Pruden,* with whom was *Robert Y. Clagett* on the brief, for appellant.

*Samuel C. Steelman, Jr.,* with whom were *Beatty & McNamee* and *John T. Tansey* and *Martin, Whitfield, Thaler & Bebchick* on the brief, for United States Fidelity and Guaranty Co., appellee.

O'DONNELL, J., delivered the opinion of the Court.

This action was instituted by the appellant, First National Bank of Southern Maryland (the Bank), against the appellee, United States Fidelity and Guaranty Company (U.S.F. & G.), upon a banker's blanket bond, for the recovery of $43,761.39, representing losses ($28,587.02) and attorneys' fees and costs ($15,174.37) all allegedly incurred as a result of the acts of

the third-party appellee, G. Robert Sellner (Sellner), who was an assistant vice-president and the general manager of the Marlow Heights Branch of the Bank, in connection with the handling by him of the account of a borrower from the Bank, Continental Electronics, Inc. (Continental). The Bank alleged that Sellner's acts fell within the provisions of the bond which covered, among other things, "any loss through any dishonest, fraudulent or criminal act of any of the employees" of the Bank. U.S.F. & G., pursuant to Maryland Rule 315, filed a third-party claim against Sellner.

Following a nonjury trial in the Circuit Court for Prince George's County before Judge James F. Couch, Jr., the trial court filed a written opinion in which findings of fact were made and directed the entry of judgments in favor of U.S.F. & G., as defendant, and in favor of Sellner, as third-party defendant. Aggrieved at this result the Bank appealed; U.S.F. & G. also appealed from the judgment in favor of Sellner in its third-party claim. Sellner filed a cross-appeal.[1] The Bank contends that the trial court was in error in concluding (a) that Sellner's conduct was not fraudulent or dishonest, and (b) that Sellner's actions were not criminal. We do not see it that way, however, and shall affirm both judgments.

The pertinent clause of the fidelity bond upon which this action was predicated reads as follows:

"THE LOSSES COVERED BY THIS BOND ARE AS FOLLOWS:

Fidelity

(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in

---

1. By leave of this Court, upon motion, Sellner was excused from filing a separate brief upon a stipulation, under Maryland Rule 855, that in the event of a reversal of the judgment in favor of U.S.F. & G. the judgment in favor of Sellner would also be reversed.

collusion with others, including loss of Property through any such act of any of the Employees." [2]

Although we shall later discuss the specific conduct upon which the appellant-Bank relies in support of its contention that its loss was sustained through the "dishonest and fraudulent acts" of Sellner, we think that a recitation of the basic and fundamental relationship of Sellner to Continental's account would here be apropos.

In 1962, Continental, a fledgling corporation, was in need of working capital to help it fulfill a million dollar contract with Western Union for the construction and installation of a microwave relay station. The late Adrian P. Fisher, president of the Bank and chairman of its board, an intimate of Continental's president, became a moving force in having the Bank's board extend loan authorization to it.

Although Sellner did not feel competent to manage the account, and so expressed his feelings to his superiors, he was commissioned to take it in his charge at the Marlow Heights Branch where the loan file, direct liability ledger and all loan records were maintained, and where he was under the direct supervision of Fisher. Sellner was under instructions to limit any notes to a 90-day basis, to obtain the signatures of not only the principals of Continental, but their wives to all such notes, to require Continental to assign to the Bank the proceeds expected under its contracts, not to issue the funds advanced at any one time, but to disburse it only as Continental needed it, to deposit all checks received into Continental's account and to maintain a close scrutiny not only on Continental's inventory, but its business affairs as well. He complied with these mandates.

Shortly after this authorization it appeared that Continental would require additional capital and the board of the Bank directed Fisher and Sellner to seek participation

---

2. The bond further provided that U.S.F.& G. would indemnify the Bank against court costs and reasonable attorneys' fees incurred and paid by the Bank, in defending any suit or legal proceedings brought against it to enforce the Bank's liability on account of any loss, claim or damage which, if established against the Bank would constitute a valid and collectible loss sustained by it under the terms of the bond.

by other banks in order to obtain additional financing. Since Continental had no other available security these efforts never came to fruition. A loan requested from the Small Business Administration was also rejected.

Within four months Continental had been advanced by the Bank a total of $96,425.

In early 1963 the officers of Continental, in order to obtain the required "security clearance" for Sellner, believed that he should become a member of its board of directors, inasmuch as they were dealing with classified data and equipment and since Sellner inspected their facilities; they voted to present him with 50 shares of stock, and designated him as "financial adviser" to the corporation. Sellner, realizing that as a Reserve Air Force officer he possessed the necessary "security clearance," rejected the proffered shares of stock. He testified that although he did attend the meetings of Continental's board, he did so only to give financial advice and to inspect its inventory, equipment and the holdings placed as security with the Bank. The evidence was uncontradicted that Sellner never received any emoluments as a result of his relationship with Continental.

During 1963 Continental received, under its contract with Western Union, a flow of cash in substantial amounts. Sellner, with the concurrence of the Bank's board, recommended that it "pay down" the line of credit as much as possible and as a result, as of December 13, 1963, Continental's indebtedness to the Bank had been reduced "to a zero balance."

In late 1963 Continental was negotiating to enter into a number of contracts with agencies of the United States Government and — as had been its predicament under the Western Union contract — needed additional operating capital. Commencing on December 18, 1963 — approximately 18 months after the original line of credit had been granted, and without any further approbation from the Bank's board — a series of $10,000 loans were made to Continental, through Sellner, on 30-day notes — renewed for longer periods of time — which reached a total outstanding

indebtedness to the Bank of over $100,000. In accordance with the instructions initially given Sellner, the signatures of the principals of Continental and their spouses were obtained upon the notes; similarly, as security, Continental made assignments, acknowledged by the United States Government, of the proceeds due under its new contracts with the various governmental agencies.

None of this latter series of notes was ever discharged and it was the Bank's loss thereon which was the basis for the Bank's claim against U.S.F. & G.

Although Continental attempted to sell its business, it succumbed to its economic problems in mid-1965. The national bank examiners directed the Bank to "charge off" the line of credit extended Continental, as of May 20, 1966, in the total amount of $99,393.36, as a "bad debt." Through the sale of Continental's inventory and by execution upon judgments obtained against its principals and endorsers on its notes, the Bank was able to reduce the total "charged off" to a net of $28,587.02 — the amount claimed as its loss under the bond.

### (a) *Dishonest and Fraudulent Acts*

In particularizing what it asserts were "dishonest and fraudulent acts by Sellner," the Bank primarily contends that he concealed and misrepresented the poor financial status of Continental. These allegations are premised upon the contention that Continental was granted a one-time loan not to exceed $75,000 rather than a "line of credit;" that the funds he advanced were in excess of the authorization and that, although he was aware that Continental was unable, in late 1963 and 1964, to pay its bills he nonetheless reported to the board — just before Continental's first loan had been "reduced to zero" that its financial condition was "good."

Both the treasurer of Continental and a member of the Bank's board in their testimony agreed that Continental had been given a "line of credit;" it was Sellner's understanding that the line of credit was not limited to $75,000 but was restricted only to the Bank's regular lending limit which,

during this interval, approximated $130,000. Although the Bank's vice president testified that the original transaction constituted a single loan to Continental, it was elicited that upon deposition he testified that the transaction had been handled as a "line of credit."

The original authorization when made in 1962 was apparently the first of this type which the Bank had made in such an amount. Indeed one of the members of the Bank's board acknowledged that even in cases where a loan has become "shaky" banks often loan additional money when in their judgment such a course appears necessary to revitalize the debtor company and thus hopefully to protect the indebtedness.

That Continental's fiscal structure was poor was self-evident to the Bank; the purpose of the initial advance was to afford it working capital. Shortly thereafter when it appeared that additional capital was required the board directed Sellner and Fisher, through participation with other lending institutions to attempt to obtain additional capital.

Although it is true that in late 1963 and 1964 Continental was unable to pay its current bills there was no showing that Sellner misrepresented its financial condition; its performance under the Western Union contract appeared to be satisfactory, the work was on schedule, and Continental, being paid regularly had a "cash flow" and seemed to be in "good" condition. It was at that time that Continental was able to completely pay-off the initial notes from the proceeds of the Western Union contract.

When, in late 1963 the series of new notes was given by Continental no new application was submitted. Sellner testified that the funds then advanced to Continental were upon the authority of the board's original resolution; he, as well as a member of the board testified that the "line of credit" had never been terminated. It was Sellner's testimony that Continental's account, after December 13, 1963 was handled exactly "in the same fashion as before" and that the same procedure was invoked in connection with

the second series of notes as had been followed initially, with Continental assigning to the Bank the funds scheduled to be received by it under its contracts with various governmental agencies. The discount committee of the board was apprised weekly of Continental's financial status; monthly reports were submitted by him concerning all loan accounts at the Marlow Heights branch, where the account was handled. Adrian Fisher, whose office was located at the branch personally supervised the Continental loan and made his own personal report about it to the board.[3] The Bank's internal auditor reported to the board semi-annually concerning the account; three members of the board, comprising an auditing committee, audited the accounts twice yearly as did the national bank examiners.

The trial court found as a fact — an issue not here seriously challenged by the appellant — that the Bank was supplied with monthly financial statements reflecting Continental's actual economic status.

Secondarily, the Bank argues that Sellner's "conflict of interest" as a result of his relationship with Continental additionally established dishonesty and fraud on his part. It contends that his endorsement of checks payable to Continental, sent to the Bank pursuant to the assignment and their deposit in its checking account, instead of being applied to discharge the notes, was fraudulent; that his membership on Continental's board, his services as its "financial advisor" and the issuance of fifty shares of its stock to him established on his part an interest in Continental, in conflict with the interests of the Bank. Similarly it contends that his conduct was "fraudulent and dishonest" when he instructed a teller to list several renewal notes of Continental's on the loan and discount sheet after the sheet had been reviewed by the Bank's board, when he assisted one of Continental's principals in filling out an incorrect personal financial statement and when he authorized payment to Digitech, Inc. from Continental's

---

3. Adrian P. Fisher, the president of the Bank and the chairman of its board died in 1967 before the litigation was instituted.

funds rather than requiring the application of those funds to the discharge of its indebtedness to the Bank.

Pursuant to the assignments made by Continental, checks in payment for its contractual services were forwarded to the Bank; although committed as a source of payment of the loans the checks were endorsed by Sellner and deposited in Continental's checking account. It was Sellner's testimony that the procedure followed by him was in accordance with the instructions of Fisher who had directed, in connection with the first series of loans to Continental, that all its checks be deposited in its checking account. Additionally, there was evidence that the checking account was administered, not at the Marlow Heights branch but at the Bank's main office. Thus, the Bank's procedures would appear to mandate a deposit in Continental's checking account for credit to it and a resultant responsibility on the personnel at the main branch or the principals of Continental to see to it that the checks received were applied to discharge the indebtedness.

In connection with Sellner's membership on Continental's board and his activities as its "financial adviser," he testified that he had been directed by Fisher "to keep an eye on" Continental's operations and to inspect its inventory and equipment (which apparently had been pledged as security for a separate loan); for these purposes he periodically visited its offices. The proffer of the 50 shares of Continental's stock and his selection as a member of its board was at the suggestion of Continental's officers only to facilitate his "security clearance;" the shares were returned when Sellner appreciated that he already possessed "security clearance." It was his testimony additionally that he never considered himself "officially" to be a member of the board, never voted at any of its meetings and did not have access to its minutes. He resigned on August 19, 1963 — approximately four months before the second series of loans was made to Continental.

There was no evidence that his membership was for other than the protection of the best interest of the Bank. This

asserted "conflict of interest" on his part did not establish evidence of dishonesty and fraud. Indeed, the trial court noted that not infrequently lenders instruct an employee to sit on the board of a corporate borrower in order to protect the interest of the lender in connection with a substantial loan.

The several entries made by the teller at Sellner's direction to which the Bank takes exception involved entries on a loan and discount sheet after that document had been reviewed by the Bank's board. The entries represented renewal notes. The teller testified that the note renewals were recorded as well on the Bank's direct liability ledger maintained at the main branch and the Bank's internal auditor was apprised of the transaction. It was Sellner's testimony that the renewal notes merely replaced earlier ones which the board had reviewed; that when the loan and discount sheet was submitted to the board the renewal notes did not contain all the necessary endorsements which were required; he withheld listing the renewal notes, in accordance with the instructions he had been given and the procedures he had earlier followed only because of their lack of the required endorsements.

In May, 1963, in connection with the initial notes made by Continental, its principals, as well as their spouses were required to pledge their personal responsibility as endorsers and personal financial data was required as part of the Bank's records. One of the directors of Continental listed $22,500 in assets representing a home he reported he owned but which in reality he rented. The testimony, however, showed that the director had an option to purchase the residence and both he and Sellner genuinely believed that under those circumstances they could consider the rental as "equity" and call it a house he "owned."

Finally the Bank contends that Sellner's conduct was fraudulent and dishonest in writing a letter to Digitech, Inc. advising that Continental would pay its account as soon as it was paid by the Air Force. The Bank argues that since it had priority on the proceeds of Continental's contracts this action by Sellner constituted a release of its security.

As a prerequisite to the receipts of payments by Continental under United States Government contracts it was necessary that the equipment developed by it be inspected for compliance with governmental specifications. Digitech, Inc. performed these inspectional services. When Continental found itself in a predicament in which the Government would not release funds to it until the contracted equipment passed inspection and Digitech would not continue its services until paid, Sellner, although he did not discuss his action with his superiors, committed some of Continental's funds to the discharge of Digitech's bill. Sellner testified that he believed that this authorization was the only method by which payments might be continued to be received by the Bank from the Government and was taken to protect what he saw as in the Bank's financial interest, secured as it was by the assignment of the proceeds under those very contracts.

There was no evidence that any money was actually paid Digitech pursuant to Sellner's authorization and hence no showing that the Bank in connection therewith sustained any loss.[4]

Notwithstanding all these alleged acts of misconduct on Sellner's part, it is interesting to note that the Bank's board, after reviewing a report from the national bank examiners dated October 4, 1965 showing Continental's dire financial straits and its indebtedness to the Bank totaling $100,185 passed a resolution referring to Messrs. Fisher and Sellner the duty of providing means by which Continental could work out repayment of the indebtedness.

When a bond conditioned for the honest performance of an employee's duties provides that it shall cover "any dishonest, fraudulent or criminal act" there can be no recovery, in an action upon the bond, for any acts or conduct of the employee which fall short of the dishonest acts of the employee within contemplation of the bond. Fraud and dishonesty are not presumed, they must be proven. *See*

---

4. It appears that Digitech, Inc. filed suit in the Circuit Court against the appellant, which was dismissed without a hearing on its merits.

*Williams v. U.S.F. & G. Co.*, 105 Md. 490, 495, 66 A. 495, 496 (1907).

When fraud, dishonesty or criminal conduct is imputed, something more than a mere preponderance of evidence must be produced; the proof must be "clear and satisfactory" and be of such a character as to appeal strongly to the conscience of the court. *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 517, 255 A. 2d 332, 340 (1969); *Bachrach v. Washington United Cooperative, Inc.*, 181 Md. 315, 321, 29 A. 2d 822, 825 (1943); *Rent-A-Car Co. v. Fire Insurance Co.*, 161 Md. 249, 268, 156 A. 847, 855 (1931).

In *World Exchange Bank v. Commercial Cas. Ins. Co.*, 255 N. Y. 1, 5, 173 N. E. 902, 904 (1930), where a bank teller who paid checks drawn against uncollected items on deposit in violation of a bank rule that such payments should not be made without the consent of an officer of the bank and where the teller believed the checks to be good, gained no benefit from the transaction, had no thought of giving anything to anyone but whose only object was the furtherance of the business of the bank was held not to be guilty, as a matter of law, of a dishonest or criminal act under a similar bond, Chief Judge Cardozo stated for the Court:

> "Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men."

This Court in *Suburban Properties Management, Inc. v. Johnson*, 236 Md. 455, 204 A. 2d 326 (1964) stated:

> "The elements of legal fraud are: (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the

purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation. *Appel v. Hupfield*, 198 Md. 374, 84 A. 2d 94; *Gittings v. Von Dorn*, 136 Md. 10, 109 Atl. 553." 236 Md. at 460, 204 A. 2d at 329.

A misrepresentation believed by the person making it to be true and not made with a reckless disregard of whether it is true or false, even though induced by negligence or ignorance, will not sustain an action for fraud. *Peurifoy v. Congressional Motors, Inc., supra; Lambert v. Smith*, 235 Md. 284, 288, 201 A. 2d 491, 493-94 (1964).

The words "fraud" and "dishonesty" as used in a fidelity bond include any act showing a want of integrity or a breach of trust. *See Fidelity & Deposit Co. of Md. v. Bates*, 76 F. 2d 160 (8th Cir. 1935); *Exeter Banking Co. v. Taylor*, 85 N. H. 458, 160 A. 733 (1932); *Miners Sav. Bank of Pittston v. Royal Indemnity Co.*, 336 Pa. 428, 9 A. 2d 543 (1939); or an abstraction of funds, together with deceit and concealment. *U.S.F. & G. Co. v. Bank of Thorsby*, 46 F. 2d 950 (5th Cir. 1931); *U.S.F. & G. Co. v. Egg Shippers' Strawboard & Filler Co.*, 148 F. 353 (8th Cir. 1906).

Liability is not imposed on an insurer for the consequences of acts done in actual good faith, without intentional fault, including constructively or technically fraudulent acts innocently done, even though they constitute a breach of obligation by the person whose fidelity is insured to the beneficiary. *See Sinclair v. Nat'l. Surety Co.*, 132 Iowa 549, 107 N. W. 184 (1906); *Curran & Treadaway, Inc. v. Amer. Bonding Co. of Balto.*, 193 La. 763, 192 So. 335 (1939); *Foster v. Bowen*, 311 Mass. 359, 41 N.E.2d 181 (1942). Nor under the terms of such a bond is the insurer liable for a loss occasioned by mere negligence, carelessness, inattention to business, mistake, errors in judgment, incompetency, or

other acts and omissions not denoting conscious wrong-doing or involving moral turpitude. *See Irvin Jacobs & Co. v. Fidelity & Deposit Co.*, 202 F. 2d 794 (7th Cir. 1953); *Curran & Treadaway, Inc. v. American Bonding Co. of Balto., supra; Village of Plummer v. Anchor Casualty Co.*, 240 Minn. 355, 61 N.W.2d 225 (1953); *Salley v. Globe Indem. Co.*, 133 S. C. 342, 131 S. E. 616 (1926).

*See also* 35 Am.Jur.2d *Fidelity Bonds & Insurance* §§ 23, 28 (1967); 45 C.J.S. *Insurance* § 802 (1946).

For a collection of cases dealing with what amounts to "fraud" and "dishonesty" within the coverage of fidelity bonds, see Annotations in: 98 A.L.R. 1264 (1935); 77 A.L.R. 861 (1932); 62 A.L.R. 411 (1929); 46 A.L.R. 976 (1927); 43 A.L.R. 977 (1926).

In *Foster v. Bowen, supra*, the director of a street railway company, who was its treasurer, with the knowledge and approval of its president, leased to himself a skating rink at an amusement resort owned by the company. He subsequently sublet the rink to another for 50% of its gross receipts. The court, noting that the board of directors had been informed of the lease although not the details of the sublease, and that the director believed that his profit was legitimate and authorized after having discussed the matter with the corporate president, held that the director was not guilty of any "fraudulent and dishonest act" under the terms of such a fidelity bond. The court pointed out that such bonds insure "against the consequences of conduct of the employee that is intentionally and consciously dishonest and fraudulent and as not insuring against the consequences of acts done in actual good faith without intentional fault." 311 Mass. at 363, 41 N.E.2d at 183.

In *First National Bank v. National Surety Co.*, 243 N. Y. 34, 152 N. E. 456 (1926) the Court of Appeals of New York reversed a verdict in favor of the plaintiff bank upon a similar bond where its cashier had permitted a depositor to draw upon checks in the process of collection. The trial court had instructed the jury that the cashier committed a dishonest act and misapplied the funds of the bank within

the terms of the bond if he knowingly permitted a depositor to draw out money from the bank before the deposits by it had cleared. There was evidence however that the practice had been going on for a long time, that the bank had previously lost no money under it, that the cashier had no knowledge of any improper practice on the part of the depositor until a few days before its bankruptcy and that he had relied on information given him by a director of the bank. In holding that the evidence presented a jury question as to whether or not the cashier was acting in bad faith and dishonestly, that court stated:

> "If the trial justice told the jury that Coe, the cashier, committed a dishonest act and misapplied the funds of the bank within the terms of the policy, if he knowingly permitted the Hamilton Dairy Company to draw out moneys from the bank on their checks before deposits by them had been cashed, he was clearly in error. If such withdrawal was authorized, or permitted by Coe *through an honest mistake in judgment, or to help his bank, or in the ordinary course of the bank's business, and without any dishonest intent or purpose,* it would *not* be an act covered by this policy, whatever else it might be as between Coe and the bank." [Emphasis supplied] 243 N. Y. at 38-39, 152 N. E. at 457.

As was stated in *Fidelity & Deposit Co. of Md. v. Bates, supra,* "[l]ike the question of negligence, the question of dishonesty must be left to the triers of fact if there is a conflict in the evidence, or even if there is no conflict, provided fair-minded men might honestly reach different conclusions." As we see it, under the facts of this case and the principles of law set forth, the issue of whether or not Sellner's acts were dishonest or fraudulent within the meaning of those terms in the bond were questions of fact for the court, sitting as a jury, to decide. *See Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.,* 426 F. 2d 729, 737 (5th Cir. 1970); *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Md., supra,* at 798-99; *London & Lancashire Indemnity*

*Co. of America v. Peoples Nat'l. Bank & Trust Co.*, 59 F. 2d 149, 152 (7th Cir. 1932); *Great American Ins. Co. v. Langdeau,* 379 S.W.2d 62, 65 (Tex. 1964).

Judge Couch, after citing *Sade v. Nat'l Surety Corp.*, 203 F. Supp. 680 (D.D.C. 1962), *aff'd* 314 F. 2d 286 (D.C. Cir. 1963), as requiring the existence of "a compelling sense of conscious wrong" involving moral turpitude and a want of integrity as elements of "dishonesty" (*see also Fidelity & Deposit Co. of Md. v. Bates, supra,* and *Foster v. Bowen, supra*) in his opinion in the lower court stated:

> "[A]s the Court of Appeals said in *Williams vs. U. S. Fidelity Company,* 105 Md. 490, 'fraud and dishonesty are not presumed, they must be proven'.
>
> The Court, viewing all of the evidence before it is not persuaded that Sellner was guilty of either a dishonest or fraudulent act. In reaching this conclusion the Court observes that thru internal procedures Sellner's actions were indeed monitored by the Bank's Discount Committee and its Board of Directors as well as its President, Mr. Fisher. It would appear to the Court that Sellner would have to be very naive to conclude he could handle Continental's loan in the fashion he did and not have it come to the attention of the Board of Directors. Further, there is not a scintilla of evidence that Sellner profited personally in anyway from his actions — indeed an ingredient usually present in matters of this kind. Finally, it is to be noted that the only member of First National's Board of Directors to testify, Scheibel, stated that Sellner's service was 'faithful.' "

> \* \* \*

> "The evidence permits a finding that Sellner was acting at all times in the Bank's interest, even to the issuance of new loans after the zero balance on the old loan had been reached. . . . Certainly there

> was sufficient evidence before the Court to conclude, and it does, that Sellner was acting in the Bank's interest, as he understood it, from the conduct of the Board, the Bank's President and his knowledge that what he was doing was easily discoverable by internal audits, reports required and made, and audits by the National Bank Examiners."

The trial court might also have noted, in connection with the Digitech transaction, that no moneys were paid to Digitech under the authorization from Sellner; hence there could be no liability under the bond until the bank had established that it sustained a loss as a result thereof. *See American Empire Ins. Co. of S. D. v. Fidelity & Deposit Co. of Md.*, 408 F. 2d 72 (5th Cir.), *cert. denied*, 396 U. S. 818 (1969). *See also* 35 Am.Jur.2d *Fidelity Bonds & Insurance* § 39 (1967); 10 Am.Jur.2d *Banks* § 88 (1963).

Although the issue of whether or not Sellner personally profited in any way is not a necessary ingredient in determining whether his acts were dishonest or fraudulent, *see Fed. Deposit Ins. Corp. v. Aetna Cas. & Surety Co.*, 426 F. 2d 729 (5th Cir. 1970); *U.S.F. & G. Co. v. Bank of Thorsby, supra; Foster v. Bowen, supra;* 35 Am.Jur.2d *Fidelity Bonds & Insurance* § 24 (1967), we cannot say, viewing the evidence in the light most favorable to the appellee, the party which prevailed below, *A. S. Abell Co. v. Skeen*, 265 Md. 53, 55, 288 A. 2d 596, 597 (1972); *Burroughs Int'l. Co. v. Datronics Eng'rs. Inc.*, 254 Md. 327, 337-38, 255 A. 2d 341, 346 (1969), notwithstanding the exhortations of the appellant-Bank to the contrary, that the trial court was clearly erroneous in its conclusion that Sellner's acts were not dishonest or fraudulent. Maryland Rule 886; *MacWilliams v. Bright*, 273 Md. 632, 331 A. 2d 303 (1975); *Fike v. Harshbarger*, 273 Md. 586, 332 A. 2d 27 (1975). We think that there was substantial evidence presented in support of the trial court's determination. *See Delmarva Drilling Co. v. Tuckahoe Shopping Center, Inc.*, 268 Md. 417, 424, 302 A. 2d 37, 40 (1973).

### (b) *Criminal Acts*

The appellant-Bank additionally contends that the loss it sustained was within the coverage of the fidelity bond because Sellner's acts violated 18 U.S.C. §§ 656, 1005 and 1014 and were thus "criminal".

Section 656 makes it a crime for "an officer, director, agent or employee of . . . any Federal Reserve bank, member bank, national bank or insured bank . . . [who] embezzles, abstracts, purloins, or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director . . . ."

Although "misapplication" covers acts which may not be included within the terms of embezzlement, abstraction, or purloinment, *Williamson v. United States*, 332 F. 2d 123, 133-34 (5th Cir. 1964), a "misapplication" requires as an essential element proof of a conversion to one's own use or to the use of another of the moneys, funds, credits, assets, etc. by the party charged. *United States v. Docherty*, 468 F. 2d 989, 993 (2d Cir. 1972); *United States v. Wiggenhorn*, 312 F. 2d 289, 292 (9th Cir. 1963). *See also United States v. Meyer*, 266 F. 2d 747 (5th Cir.), *cert. denied*, 361 U. S. 875 (1959).

Section 656 has been construed to require the existence of an intent to injure, defraud or deceive a bank within the Federal Reserve system, or a federally insured bank, as a necessary ingredient of the crime created by the statute. *United States v. Giordano*, 489 F. 2d 327 (2d Cir. 1973); *United States v. Docherty, supra; Giragosian v. United States*, 349 F. 2d 166 (1st Cir. 1965); without such an intent the statute is not violated.

The Bank argues that "subjecting a bank to an indefensible risk amounts to a reckless disregard of the bank's interest and amounts [on the part of Sellner] to an intent to injure or defraud it." Although it has been held that one may be shown to have acted with such a reckless disregard of a bank's interest as to justify the existence of an

intent to injure or defraud, *Giordano v. United States, supra;* *Logsdon v. United States,* 253 F. 2d 12 (6th Cir. 1958) (where the intent to injure or defraud the bank was shown by circumstantial evidence); and although it has also been held that an officer of a bank "misapplies" its funds when he willfully makes an unauthorized loan, *Giordano v. United States, supra,* or unauthorizedly advances funds to a customer, *Logsdon v. United States, supra,* not every "misapplication" is criminal, *United States v. Meyer, supra.*

"Willful misapplication" within the proscription of the statute means a criminal misapplication, with intent to injure and defraud; mere acts of maladministration of the affairs of the bank are not sufficient to establish a violation of 18 U.S.C. § 656. *United States v. Docherty, supra; United States v. Meyer, supra,* both citing *United States v. Britton,* 107 U. S. 655, 667 (1882).

In holding that this Section was inapplicable, the trial court pointed out that it did not find from the evidence any "proof of Sellner's intent to defraud the bank," a conclusion which we cannot say was clearly erroneous upon the evidence presented.

18 U.S.C. § 1005 provides that:

"Whoever, being an officer, director, agent or employee of any Federal Reserve bank, member bank, national bank or insured bank, *without authority from the directors of such bank,* issues or puts in circulation any *notes* of such bank; or

Whoever, *without such authority,* makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, *bill of exchange,* acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

Whoever makes any *false entry* in any book, report, or statement of such bank *with intent to injure or defraud* such bank, or any other company, body politic or corporate, or any individual person,

> or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System . . ." (emphasis supplied)

commits a misdemeanor.

Each of the clauses of the statute constitutes a separate offense; the first clause, limited in its application to "officers, directors, agents or employees," of a federal related bank, prohibits the issuance of the putting into circulation of *notes* of the bank, without authorization from its directors; the second clause, without definition of any class, makes it a federal offense for one, without authorization from the bank's directors, to make, draw, issue, put forth or assign a number of obligations; the third clause makes it criminal for one to make a false entry in the books of such a bank with intent to defraud. The class, within the third clause, is not restricted to bank officials and employees and its violation is not dependent upon an absence of authorization by the directors. *See United States v. Edick*, 432 F. 2d 350, 352 (4th Cir. 1970).

Since no "notes of the bank" are here involved, the first clause is patently inapplicable. Since the trial court found that in none of Sellner's acts did he have an "intent to defraud" the Bank, the third clause is equally inapplicable.

The Bank in arguing that the second clause of the statute is applicable contends that Sellner issued its "bills of exchange," the Bank's checks to Continental upon the second series of notes. Relying upon language in *Harrison v. United States*, 279 F. 2d 19 (5th Cir.) *cert. denied* 364 U. S. 864 (1960) the bank argues that such an offense is criminal per se without the necessity of proof of an intent to injure or defraud it.

In *Harrison*, the appellant, a druggist, was the mayor of the City of Warner Robins and a director of the Citizens State Bank in that city; he was indebted to the bank in the amount of $35,500 at a time when the rules of the bank,

adopted by its board, prohibited any direct indebtedness by any of its directors in excess of $20,000. Additionally, contrary to a rule against overdrafts, Harrison's indebtedness to the bank included a business overdraft of $6,6000. Notwithstanding a requirement that the bank's discount committee approve "all applications for loan and credit," the bank's president, without authorization of its board, in collusion with Harrison agreed to have a cashier's check issued to him in the net amount of $19,700 to be applied in discharge of his personal indebtedness, in exchange for a promissory note in the amount of $20,000 issued in the name of the municipality. The evidence established that the note given by Harrison was not a legal obligation of the city but was, in fact, a device for the obtention of credit by the appellant.

Pointing out that "[i]t would be a fraud on the bank if the bank's funds were caused to be so manipulated as to bring the appellant's account into apparent compliance with the rules of the bank when, in fact, if the truth were known, the transaction producing this effect was a total sham," the court, in affirming the appellant's conviction, stated:

> "In light of the undisputed fact that the drawing of a Cashier's check intended by the official of the bank to be for the benefit of appellant was not authorized by the directors of the bank but was, in fact, an effort to contravene the action taken by the directors respecting both the debt limit and overdraft of a director, the jury was fully justified in finding appellant guilty of the violation of this section." 279 F. 2d at 23.

Even though that court did state that "a casual reading of this section makes plain that no specific intent to injure or defraud a bank is an ingredient in the offense charged in the first two paragraphs of Section 1005. Each of the first three paragraphs states a separate and distinct crime. Neither the first nor the second requires proof of any intent to injure or defraud the bank. The acts described in those two paragraphs are made criminal per se." The court, however,

expressed the further view that the indictment charged " 'that the issuing of the cashier's check was done' with intent to defraud the bank and the depositors thereof" and "that there was ample evidence from which the jury could find the necessary intent to defraud the bank if that had been a necessary ingredient of the crime."

In urging upon us the ruling in Harrison that the issuance of such "bills of exchange" by Sellner were per se criminal, the appellant-Bank overlooks the fact that as a condition precedent to the applicability of the second clause in § 1005 it must be shown that such issuance by him was "without authority from the directors" of the bank.

The trial court, in holding 18 U.S.C. § 1005 to be inapplicable, was "not persuaded that what he did was 'without authority from the directors' " and pointed out that "the evidence permits a finding that Sellner was acting at all times in the Bank's interest, even to the issuance of new loans after the zero balance on the old loan had been reached." Again, we cannot say that the trial court in reaching this conclusion, was clearly erroneous.

18 U.S.C. § 1014, as amended by Public Law 91-609, Title IX, § 915, 84 Stat. 1815, effective December 31, 1970, as to loans, renewals and discounts provides that:

> "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

Antecedent to December 31, 1970 the statute was applicable to specified federal agencies but banks, such as

the appellant-Bank, whose deposits were insured by the Federal Deposit Insurance Corporation were not within the protection of § 1014.

Although the Bank recognizes that this statute cannot be invoked in connection with the acts of Sellner during the years 1963 and 1964, it argues that Congress, by its enactment recognized that the making of false statements or reports, or the overvaluation of properties or securities in connection with loans or renewals was of such a "dishonest character" as to make such conduct criminal. Although the argument is novel, manifestly, the statute was inapplicable during the interval in question and resort to its provisions, as amended in 1970, as evidence of criminality on Sellner's part is devoid of merit.

For the reasons assigned, the judgment of the Circuit Court for Prince George's County in favor of the United States Fidelity and Guaranty Company must be affirmed. It follows that the judgment in favor of Sellner, as third-party defendant, must be affirmed as well, since his liability to U.S.F. & G., under the pleadings here was contingent upon U.S.F. & G.'s liability to the Bank under the bond, *see Giant Food, Inc. v. Washington-Rockville Ind. Park,* 254 Md. 100, 108-09, 253 A. 2d 867, 871-72 (1969); *White v. Land Homes Corporation,* 251 Md. 603, 609, 248 A. 2d 159, 162 (1968).

> *Judgments affirmed; costs to be paid by appellant, First National Bank of Southern Maryland.*