**FRED MENKE'S CAR STORE, INC.**
**Frederick R. Menke, Sr., Plaintiffs,**

v.

**VOLVO NORTH AMERICA**
**CORPORATION,**
**Defendant.**

**Civ. No. H–86–1150.**

United States District Court,
D. Maryland.

June 15, 1987.

Roger C. Simmons and Steele, Simmons & Fornaciari, Washington, D.C., for plaintiffs.

Robert L. Green, Jr. and Howrey & Simon, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Chief Judge.

Presently pending in this civil action is defendant's motion for summary judgment. In this suit, plaintiffs Fred Menke's Car Store, Inc. (hereinafter "the Car Store") and Frederick R. Menke, Sr. (hereinafter "Menke") allege that defendant Volvo North America Corporation (hereinafter "Volvo") wrongfully induced Menke to sign an agreement whereby he voluntarily terminated his company's dealership franchise to sell automobiles distributed by Volvo. Menke is the sole owner and the principal officer of the Car Store. The complaint asserts claims against Volvo under the federal, Maryland and New Jersey Automobile Dealer Day in Court Acts, and under the common law of Maryland for fraud, breach of contract and related tortious conduct. Plaintiffs seek rescission of the termination agreement, damages, injunctive relief and a declaratory judgment reinstating the Car Store as a dealer of Volvo automobiles. Jurisdiction herein rests on 28 U.S.C. §§ 1331 and 1332.

The parties have submitted exhaustive memoranda with numerous exhibits filed in support of and in opposition to the pending motion. Both sides have conducted ample discovery. Indeed, as part of record the record before the Court are extracts from some ten depositions plus copies of over one hundred documents. On May 1, 1987, this Court heard oral argument regarding this motion. For the reasons stated herein, defendant's motion for summary judgment will be granted. Because of its ruling on defendant's motion for summary judgment, this Court need not consider certain other pending motions.

## I

### Factual Background

The relevant facts are as follows. The Car Store's association with Volvo began as early as 1957, when a predecessor corporation was awarded one of the first Volvo dealership franchises in Maryland. Menke's connection with Volvo dates back some 26 years to 1961 when Menke was first employed by the Annapolis dealership that preceded the Car Store. In 1976, Menke acquired 100% of the stock and became president of the Car Store's predecessor. On May 2, 1977, Menke executed on behalf of the Car Store's predecessor a

franchise agreement (termed "Sales Agreement") permitting him to sell and service Volvos at 284 West Street in Annapolis. The Car Store continued operations under that agreement until termination of the franchise in July of 1985.

Prior to February 1985, the Car Store held franchises for Pontiac, GMC Trucks and Nissan/Datsun vehicles, in addition to its Volvo franchise. The Car Store ran all of its operations out of a single five acre complex bounded by West Street and Taylor Avenue in Annapolis. In 1983 and 1984, the Car Store's operations were not profitable, and indeed it lost substantial amounts of money. Some time in 1984, because of cash flow problems, Menke decided to sell the Car Store's Nissan dealership. Accordingly, on February 22, 1985, after receiving the approval of the American subsidiary of Nissan, the Car Store's Nissan franchise was sold to the Tate Organization (hereinafter "Tate") of Baltimore. As part of the deal, Tate also leased that portion of the Car Store's complex which fronted on West Street and which housed facilities from which the Car Store had previously operated all four of its dealerships.

Menke planned to relocate the Car Store's three remaining franchises to another part of the five acre complex, which fronted on Taylor Avenue. Prior to the consummation of the deal with Tate, Menke had notified Volvo of the proposed sale of the Nissan dealership and his intended relocation of the Volvo dealership. From the moment it first became apprised of Menke's plans, Volvo opposed them. Volvo believed that the Taylor Avenue facilities were inadequate, and it insisted that under the terms of the Car Store's 1977 dealership agreement, the proposed relocation required its prior approval.

Although the Taylor Avenue lot was contiguous to the West Street lot that was being leased to Tate, the Taylor Avenue location was less desirable for a number of reasons. West Street is the site of "auto row" in Annapolis; indeed, the Car Store's original Volvo showroom on West Street was in the very center of this prime auto-

mobile retail area. While the proposed Volvo showroom on Taylor Avenue was located in a newer building, it was not located on Annapolis' "auto row," and the new showroom faced a cemetery.

Volvo had other even more serious objections to the proposed Taylor Avenue facilities. At least on an interim basis, Menke proposed to house the parts and service departments of the Volvo dealership in quarters that were separate from the Volvo showroom. A portion of the space allocated to Volvo parts storage was to be provided by temporary trailers parked on the Taylor Avenue lot. Likewise, the new service write-up desk was to be located in another trailer which was separated from the main service building. Most importantly and in spite of Menke's assurances to the contrary, even the most optimistic projections for the Taylor Avenue operation would have failed to satisfy the published requirements for service and parts facilities for the Car Store's combined Pontiac, GMC and Volvo dealerships. Not surprisingly, Volvo found Menke's proposals unsatisfactory, and Volvo sent him express written disapprovals prior to the Tate sale, on February 14 and 20, 1985. In spite of these stated disapprovals, Menke chose to proceed with the lease of the West Street facilities to Tate and the relocation of the Car Store's Volvo dealership in the Taylor Avenue facilities.

The Tate deal and the relocation took place on February 22, 1985. On February 25, 1985, Volvo sent a representative to Annapolis who confirmed the unauthorized relocation and took photographs, which were then sent to Volvo's head office in Rockleigh, New Jersey. Thereafter, on March 4, 1985, Volvo sent Menke notification that the Car Store's Volvo franchise was terminated, effective April 10, 1985, because of the unauthorized move of its place of business in violation of provisions of the dealership agreement. The notice period given by Volvo corresponded to that provided for in the Car Store's dealership agreement. Volvo again noted that the new Taylor Avenue facilities did not comply with Volvo's objective published requirements and cited this fact as an addi-

tional breach of the Car Store's dealership agreement.

Following receipt of the termination letter, Menke consulted with an attorney and reviewed with him possible avenues for relief, including arbitration, administrative proceedings against Volvo before the Maryland Motor Vehicle Administration and a Dealer's Act suit against Volvo. At a meeting between Menke, his attorney, and Volvo executives in New Jersey on March 27, 1985, Volvo agreed to extend the date of termination for one week or until April 17, 1985. The insurmountable problem faced by Menke in connection with all of his plans for forestalling termination of the dealership agreement was the time necessary for the construction of adequate onsite parts and service facilities which would meet Volvo's requirements. Because of its concern about the inadequate parts and service facilities at Taylor Avenue, Volvo consistently refused to consider any plans that would take a year or more to complete. Menke and his attorney, however, were left with the "impression" that Volvo would consider plans that provided for the construction of adequate parts and service space in "somewhat less than" a year.

On April 16, 1985, Menke sent Volvo additional construction plans that called for an approximate completion date of March 15, 1986. Volvo rejected this plan on April 22, 1985 as "entirely inadequate," and again expressly noted that a one-year period of delay was unacceptable.

At or about this time, Menke entered into a "handshake deal" to sell the Car Store's Volvo dealership to Louis Phipps (hereinafter "Phipps"), an Annapolis Buick dealer. Without disclosing the tentative sale to his attorney, Barry J. Dalnekoff (hereinafter "Dalnekoff"), Menke asked Dalnekoff to bargain with Volvo for the purpose of extending the date of termination voluntarily so that a sale could be concluded within a 90–day period. An agreement was thereupon reached. The Voluntary Termination Agreement (hereinafter "VTA"), executed on May 16, 1985, provided that the Car Store's franchise would terminate without further notice on July 5, 1985, and that in return the plaintiffs would release Volvo from any claims it might have arising out of their business relationship. Plaintiffs specifically agreed to:

... release and forever discharge VOLVO of and from any and all manner of action(s), cause(s) of action, suits, debts, accounts, promises, warranties, damages, claims, demands, and liabilities of every kind and character, direct and indirect, known and unknown of whatever kind or nature in law or in equity, arising under any provisions of law of the United States, the States of Maryland, New Jersey, or any other State, that MENKE now has or claims to have, or has at any time heretofore had or claimed to have had, against VOLVO, arising in whole or in part, out of the business relationship that existed between VOLVO and MENKE pursuant to the Volvo Sales Agreement dated May 2, 1977. ...

Plaintiffs further acknowledged:

... for itself, its successors and assigns, that all claims that it now has or may have against VOLVO are fully and completely released and discharged. ...

Paragraph 8 of the VTA provided as follows:

8. EACH OF THE PARTIES TO THIS AGREEMENT ACKNOWLEDGES THAT THIS AGREEMENT IS MADE AND EXECUTED BY IT OF ITS OWN FREE WILL; THAT IT KNOWS ALL OF THE RELEVANT FACTS AND ITS RIGHTS IN CONNECTION THEREWITH; AND THAT IT HAS NOT BEEN IMPROPERLY INFLUENCED OR INDUCED TO MAKE THIS AGREEMENT AS A RESULT OF ANY ACT OR ACTION ON THE PART OF ANY PARTY OR EMPLOYEE, AGENT, ATTORNEY OR REPRESENTATIVE OF ANY OF THE PARTIES TO THIS AGREEMENT.

Pursuant to the VTA, Volvo agreed to allow the Car Store to attempt to find a purchaser, but required that the dealer application and supporting documents be submitted to Volvo by June 21, 1985, which was two weeks prior to the termination date. Volvo further agreed to consider in good faith the timely application of any

proposed purchaser. However, the VTA expressly provided that Volvo reserved the right to reject any proposed purchaser if, in its sole discretion, it deemed the purchaser unsuitable.

Before Menke signed the agreement, Dalnekoff went over it word for word with him. Both Menke and Dalnekoff signed the agreement. Upon receiving a copy of the executed agreement, Dalnekoff forwarded it to Menke with a cover letter that stated: "[p]lease remember that the time limitations contained in the [VTA] will not be extended and that immediate action is necessary."

Unfortunately for Menke, in mid-June and just prior to the June 21 deadline, Menke learned that Phipps was negotiating to purchase a Subaru dealership in Annapolis. Menke's deal with Phipps accordingly fell through, and Menke had to scramble to find another buyer. Menke did find another buyer, Everett Hellmuth, but the agreement with Hellmuth was not executed and submitted to Volvo until July 1, 1985, well after the June 21, 1985 deadline. In spite of Menke's failure to meet the agreed deadline, Volvo consented to consider Hellmuth's application in any event. Hellmuth, who was the general manager of another Washington area Volvo dealer, was basically a satisfactory applicant in Volvo's view. Under the terms of his deal with Menke, however, Hellmuth proposed to run the Volvo franchise out of the same Taylor Avenue facilities that Volvo had already repeatedly told Menke were inadequate and unsatisfactory. Thus, Volvo summarily rejected Hellmuth's application on July 2, 1985.

Volvo had repeatedly advised Menke and Dalnekoff that Menke would receive no further extensions beyond July 5. The VTA itself provided that "time shall be of the essence, and ... dates, deadlines and/or timetables shall not be subject to extension." Accordingly, the Car Store's Volvo dealership was finally terminated on July 5, 1985.

After the termination of the dealership, Volvo had no representative in Annapolis until some six months later when Harry Martens was selected in December of 1985 to operate a new Volvo franchise in Annapolis. For approximately 30 years, members of the Martens family had owned and operated a large, successful Volvo dealership in Washington, D.C. When Volvo concluded that Martens personally should not operate the new Annapolis franchise because it would violate Volvo's policy on cross-ownership, Martens' son Steuart was substituted as the proposed owner of this new dealership. The Martens family also owned and operated a Subaru dealership in Annapolis. In June of 1985, the Martens had contracted to sell their Annapolis Subaru dealership to Phipps, but this deal failed when Subaru's American distributor rejected the proposed transfer in October of 1985. Steuart Martens eventually opened the new Volvo dealership in July of 1986, which was approximately one year after the Car Store's franchise had been terminated.

Among their other claims, plaintiffs allege that they sustained damage because of the existence of a civil conspiracy which arose from the fact that another son of Harry Martens, John Christopher ("Chris") Martens, had preliminary discussions with Menke as to the purchase of the Car Store's Volvo, Pontiac and GMC dealerships in late 1984 and early 1985. These discussions ended in January or February of 1985 when Chris Martens concluded that Menke's asking price was excessive. Plaintiffs allege that Volvo terminated the Car Store's franchise in bad faith so that it could later award the Annapolis franchise to Martens through his other son, Steuart. Chris Martens is a minority shareholder in the holding company that owns Harry Martens' Volvo dealership in Washington. However, Chris Martens has no other connection with either the Washington or Annapolis Volvo dealerships. Chris Martens currently works as a real estate broker in Chevy Chase, Maryland.

## II

### Summary Judgment Principles

In its motion, defendant seeks summary judgment as to all claims asserted against

it by plaintiffs. It is well settled that a defendant moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.*

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, "a mere scintilla of evidence is not enough to create a fact issue, there must be evidence on which a jury might rely." *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967) quoted in *Barwick v. Celotex Corp., supra*, at 958–59. In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company*, 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.*, any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two recent cases, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson*, the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 2512 (emphasis added).

In *Catrett*, the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 2555.

The Fourth Circuit recently discussed in *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial."

At 1128 (citing *Celotex, supra,* 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court concludes that defendant's motion for summary judgment must be granted.

## III

### *Discussion*

In their 31–page verified complaint, plaintiffs assert claims for damages in eight separate counts: (1) fraudulent misrepresentation, fraud in inducement and common law fraud and deceit; (2) breach of the Voluntary Termination Agreement; (3) breach of the Car Store's dealership agreement; (4) wrongful termination in violation of the federal Automobile Dealer's Day in Court Act; (5) wrongful termination in violation of the Maryland Automobile Dealer's Day in Court Act; (6) wrongful termination in violation of the New Jersey Automobile Dealer's Day in Court Act; (7) tortious interference with prospective economic advantage and business relations; and (8) civil conspiracy. Plaintiffs also seek a declaratory judgment voiding or reforming the VTA. At oral argument, counsel for plaintiffs conceded that defendant's objection to the claim asserted under the New Jersey Dealer's Act was well taken, and this claim has accordingly been abandoned.

Of the seven remaining claims, the initial two are by far the most important. If plaintiffs are unable to establish a triable issue of material fact as to whether the VTA is voidable or whether defendant breached the VTA, the VTA, by its explicit terms, clearly bars all of plaintiffs' other claims as a matter of law.

### (a)

### *The bar of the VTA*

■ Although the Court will undertake to discuss plaintiffs' contentions at some length, the essential basis for the Court's determination that summary judgment is appropriate in this case can be stated quite simply. A dispute arose between the parties as to Volvo's right to terminate the Car Store's dealership franchise. This dispute was resolved when plaintiffs, represented by counsel, entered into a written agreement (the VTA) whereby Volvo extended the period of the franchise for a short period of time and plaintiffs agreed that it would not thereafter sue Volvo and assert any claim arising out of their business relationship. This was a voluntary agreement which the Court finds on the record here to be valid and enforceable. Pursuant to this agreement (the VTA), plaintiffs are barred from suing defendant in this case.

### (b)

### *Fraud*

■ Plaintiffs' claim of fraud is based on alleged misrepresentations made by Volvo concerning its intentions to consider in good faith prospective transferees of the Car Store's Volvo franchise. Plaintiffs contend that but for such misrepresentations they would not have entered into the VTA.

Maryland law, which is controlling on this issue, does recognize a cause of action for fraud based on fraudulent representations of future intentions. *Bagel Enterprises, Inc. v. Baskin & Sears,* 56 Md.App. 184, 203, 467 A.2d 533 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984). Such a claim is different from a suit for breach of contract in that "[t]he gist of the fraud in such cases is not the failure to perform the agreement, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the promisee by such false promise." *Tufts v. Poore,* 219 Md. 1, 12, 147 A.2d 717 (1959).

In Maryland, fraud can be proved only by clear and convincing evidence. *First National Bank v. United States Fidelity & Guaranty Co.,* 275 Md. 400, 411, 340 A.2d 275 (1975); *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 230, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984). When considered on the full record here, plaintiffs' laundry list of "undisputed facts" offered in support of the claim of fraud falls far short of this standard of proof. Plaintiffs' claimed "facts" are insufficient to raise a triable issue of materi-

al fact. *See* Rule 56, F.R.Civ.P. Most of these so-called "facts" cited by plaintiffs are not facts at all, but merely plaintiffs' highly colored interpretations of Volvo's acts and of its motivations therefor. Other "facts" are no more than self-serving conclusory assertions which are unsupported by the present record. The few actual facts included in plaintiffs' list simply do not support their contentions which will be discussed in detail hereinbelow.

Plaintiffs have also relied upon the same alleged fraudulent misrepresentations as grounds for invalidating the VTA. Under Maryland law, the requirement of clear and convincing evidence is likewise the applicable standard for voiding a release. *See Peters v. Butler*, 253 Md. 7, 10–11, 251 A.2d 600 (1969) (A party seeking to invalidate a release "must go beyond offering a preponderance of proof and meet the stringent requirement of producing evidence that is clear, precise and convincing to the point of reasonable indubitability.").

The most serious allegation of fraudulent inducement is that Volvo promised to accept any qualified applicant, without regard to the facilities the applicant proposed to occupy on an interim basis. Not only is this contention contrary to common sense and in context contrary to the language of the VTA, but it is also refuted by the sworn testimony of Menke's attorney, Dalnekoff. At his deposition, Dalnekoff stated that in the negotiations leading up to the drafting and execution of the VTA, Volvo always coupled any discussion of an acceptable transferee with discussion of an acceptable facility. Other asserted instances of fraudulent inducement cited by plaintiffs have even less merit.

(c)

*Duress*

Plaintiffs next argue that Menke signed the VTA under duress. Plaintiffs' claim of duress is based upon Menke's deposition testimony that he agreed to the terms of the VTA only because he felt he had "a gun to [his] head." Menke's subjective feeling of duress is clearly insufficient to void the release. In order to establish legal duress, plaintiffs must show: (1) that they involuntarily accepted the terms of Volvo; (2) that the circumstances permitted no other alternative than to enter into the release; and (3) that the intolerable circumstances resulted from coercive acts by Volvo. *See Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 40–41 (W.D.Mo.1982); *Schmitt–Norton Ford v. Ford Motor Co.*, 524 F.Supp. 1099, 1104 (D.Minn.1981), *aff'd*, 685 F.2d 438 (8th Cir.1982). Whether the facts alleged by a plaintiff are sufficient to raise the defense of duress is a question of law for the Court. *See Oskey Gasoline & Oil Co., Inc. v. Continental Oil*, 534 F.2d 1281, 1285 (8th Cir.1976); *Grand Motors, supra*, 564 F.Supp. at 40.

On this record, plaintiffs have utterly failed to establish any of the three required elements of duress. In *Grand Motors*, the plaintiffs had similarly sought to invalidate a release on the basis of claimed economic coercion. Plaintiffs there argued that they signed the release at the insistence of defendant Ford Motor Company because otherwise Ford would have refused to redeem their substantial inventory of unsold vehicles, parts and the like upon the termination of plaintiffs' dealership. Plaintiffs asserted that they would have incurred significant interest and storage costs if Ford did not repurchase their inventory. Judge Roberts of the Western District of Missouri stated:

> Although it was not an economically desirable alternative for them, plaintiffs could have refused to sign the release, sold the inventory elsewhere, and sued Ford for the resulting damages. Plaintiffs' decision not to pursue this course was prompted by economic self-interest and the exigencies of time caused by the pending expiration of the lease, rather than any acts attributable to Ford.
>
> ... Even if I assume that selling the inventory elsewhere was not a viable option ..., the factor of overriding significance remains that plaintiffs have failed to point to any evidence tending to show that their dilemma was the result of wrongful or oppressive conduct by Ford. The urgency caused by the pending expi-

ration of the lease was the plaintiffs' own doing....

Nor is plaintiffs' claim of duress established by the fact that Ford insisted upon execution of the release prior to accepting a return of the inventory.... It is established beyond peradventure that duress will not be implied from the making of a hard bargain or from a showing that a release was given under the press of adverse business conditions.

*Id.* at 40–41.

Similarly, in this case, plaintiffs' decision to sign the VTA was prompted by their own economic self-interest. Here, as in *Grand Motors,* the coercive circumstances which plaintiffs claim induced Menke to execute the agreement of release were entirely of Menke's own doing. Menke had relocated the Car Store's Volvo dealership in the face of Volvo's express repeated disapprovals of his proposals. This Court concludes as a matter of law that Volvo's refusal to give its approval to the proposed relocation was not unreasonable. Once the dealership was relocated without approval, the Car Store had clearly breached the dealership agreement. This Court accordingly finds on the record here that the dealership was properly terminated by Volvo for good cause and that Volvo was not responsible for any economic pressure which might amount to duress.

Moreover, as in *Grand Motors,* various alternatives were available to Menke rather than merely signing the VTA without protest. Indeed, these options are even recognized in plaintiffs' verified complaint:

Menke knew that he could have .effectively stayed any attempted termination by filing a protest pursuant to the arbitration provisions of his Volvo dealership franchise agreement, or by filing a protest pursuant to his rights as a dealer/franchisee under Maryland or New Jersey law. Menke was aware that, if Volvo sent notice of termination in compliance with law and if he exercised his arbitration rights under the Volvo dealership agreement or his statutory protest rights under Maryland or New Jersey law, termination would have been stayed

pending a resolution of the protest proceeding and Volvo would have had no choice but to give him adequate time to satisfy its purported objections.

Complaint, at 10–11. Thus, plaintiffs' own complaint conclusively belies their argument that Menke had no alternative but to enter into the VTA.

In view of the facts of record here, plaintiffs' attempts to void the VTA on grounds of duress are even less meritorious than those held insufficient as a matter of law in *Grand Motors.* In this case, Volvo was not the party that requested or insisted upon the execution of an agreement of release. It is undisputed that here Menke, through his attorney, expressly suggested to Volvo that the parties enter into an agreement which would allow for the termination of the dealership on a voluntary basis. The fact that Menke believed that he had concluded a deal to sell the Car Store's dealership, and that this deal later fell through due to no fault of Volvo's tends to further undercut any claim of duress in this case.

(d)

*Failure of consideration*

■ Plaintiffs' attempt to void the VTA for lack of consideration is similarly unavailing. Plaintiffs argue that the only consideration Menke received under the VTA was Volvo's promise that Volvo would fully and fairly consider proposed transferees of the franchise and that Volvo was already contractually bound to so consider proposed new franchisees under the Car Store's dealership agreement. There is no merit to these contentions.

When negotiations began as to the VTA, Volvo had properly terminated the Car Store's dealership because of its unauthorized relocation and the inadequacy of the new Taylor Avenue parts and service facilities. As a result of the execution of the VTA, the Car Store gained the right to continue to act as a Volvo dealer until July 5, 1987, the right to sell the franchise within the specified period of time, and the right to have Volvo consider in good faith any prospective transferee who had submitted a timely application. Before Menke

signed the VTA, the Car Store had no further rights concerning its terminated Volvo dealership. After Menke had signed the VTA, the Car Store possessed valuable rights concerning the disposition of its temporarily reinstated Volvo dealership. By signing the VTA, Menke not only continued in possession of the dealership for a short period of time but in addition bought valuable time for the consummation of the sale of the dealership. This additional time gained by plaintiffs under the VTA is sufficient in itself to preclude invalidation of the agreement under a theory of lack of consideration. *See, e.g., Nalle v. First National Bank,* 412 F.2d 881, 884 (4th Cir.1969) (mere inadequacy of consideration will not avoid a release; "some element of bad faith or overreaching conduct" is required).

■ Plaintiffs further argue that Volvo's initial termination notice was not in compliance with § 15–209(a)(2)(i) of the Transportation Article of the Maryland Annotated Code, which requires that at least 90 days' prior written notice must be given before a dealership may be terminated. Plaintiffs contend that there was a failure of consideration because Volvo was already bound by Maryland law to provide the Car Store with much of the additional time it received under the VTA. There is likewise no merit to this argument.

Section 15–209(b)(1) provides for the reduction of the required 90–day notice period to a 15–day period, "if the ground for the termination ... is the dealer's inability to reasonably serve the interests of the public." In *Annapolis Motors, Inc. v. Motor Vehicle Administration,* [1980–83 Transfer Binder] Bus. Franchise Guide (CCH) Para. 7831, at 13,151 (Md.Cir.Ct. 1982), the Circuit Court of Montgomery County affirmed the holding of the Motor Vehicle Administration that a 15–day notice of termination was proper in light of the dealer's breach of certain provisions of its dealership agreement concerning financial reporting, maintenance of a line of credit, and automobile inventory requirements.

The *Annapolis Motors* court construed the dealer's breaches as sufficiently serious to permit under § 15–209(b)(1) the dealer's

termination upon only 15 days' notice. Here, plaintiffs' breaches were even more substantial. The inadequate parts and service facilities at the Taylor Avenue location would clearly impair the Car Store's ability to serve its customers in the manner contemplated by the dealership agreement.

In any event, Volvo's initial letter of termination gave 37 days' notice rather than 15, and the Car Store's Volvo dealership was not actually terminated until more than 120 days after the initial notice of termination. Volvo gave Menke significantly more time to locate a buyer under the VTA than it was already legally or contractually obligated to give. Under the circumstances, this Court concludes that Menke received valuable consideration for entering into the VTA.

### (e)
### *Breach of the VTA*

■ Plaintiffs' claim for breach of the VTA is based upon Volvo's alleged failure to consider in good faith Hellmuth as a prospective buyer of the Car Store's Volvo dealership. In support of this contention, plaintiffs rely on novel interpretations of Volvo's obligations under the VTA. These suggested interpretations either are contradicted by the express language of the VTA or are unsupported by the present record.

Plaintiffs advance two main arguments in support of their claim that Volvo breached the VTA: (1) that under the VTA, Volvo was bound to approve any qualified applicant, and Hellmuth was a qualified applicant; and (2) that Volvo failed to consider prospective purchasers in good faith as was its obligation under the VTA. There is no merit to either of these arguments.

Paragraph 10 of the VTA provides that: Wherever, in this Agreement, reference is made to specific dates, deadlines or timetables, it is expressly agreed that time shall be of the essence, and such dates, deadlines and/or timetables shall not be subject to extension.

Paragraph 3 of the VTA states:
All such information [relating to a prospective transfer of the Car Store's dealership] must be received by VOLVO two

weeks prior to the termination date. VOLVO undertakes that it will in good faith examine the timely application of any such proposed purchaser, but MENKE agrees that VOLVO may reject any such proposed purchaser if, in VOLVO's sole judgment and discretion, VOLVO determines the applicant to be unsuitable.

Paragraph 3 makes it clear that Volvo's obligation under the VTA was to examine in good faith the timely "application" of a prospective transferee. This was done. Volvo had every right under the agreement to reject Hellmuth's application if after examining it Volvo reasonably believed that the facilities he proposed to utilize were unsatisfactory. Volvo even did more than it was required to do here. It could have rejected Hellmuth's application because it was not timely filed. Rather, it agreed to consider the application even though it was not completed until July 1, 1985, well after the June 21, 1985 deadline.

Plaintiffs have also argued that Volvo failed to consider prospective transferees in good faith. Plaintiffs rely on two acts on the part of Volvo, namely (1) its failure to provide Menke with the necessary application forms so that the June 21 deadline could be met; and (2) its rejection of Hellmuth on July 2, 1985, when the application had been completed only the day before, on July 1.

First, plaintiffs' claim that Volvo failed to provide the necessary forms is unsupported by the present record. The only prospective buyer who ever reached the stage where forms were needed was Hellmuth. Hellmuth had completed and submitted the required forms to Volvo in time to meet the June 21 deadline. But Hellmuth's application remained incomplete because Menke and Hellmuth did not until July 1 finalize and commit to writing the terms of the buy/sell agreement between them. Until this crucial document was submitted, it was entirely reasonable for Volvo to take no action on Hellmuth's application. Under these circumstances, there was hardly any breach of the agreement because of Volvo's failure to provide forms to

Menke. Indeed, Hellmuth testified at his deposition that he could not remember any delay caused by Volvo's failure to supply necessary forms.

Second, even though the normal period of time for Volvo to consider a prospective transferee's application may have been several weeks, the fact that Volvo here took only one day to reject Hellmuth's application does not indicate a lack of good faith on its part. Several factors contributed to the summary rejection of Hellmuth. As noted previously, even though the VTA specified that "time was of the essence," Hellmuth's application was not submitted in a timely fashion. Moreover, the firm date for termination of the Car Store's dealership, a date which the VTA explicitly stated would not be extended, was July 5, 1985. Since Hellmuth's application was not completed until July 1, Volvo would obviously have had to consider it in an expedited fashion. Even more significant is the fact that Hellmuth proposed to run his dealership from the same Taylor Avenue facilities described hereinabove. Volvo had repeatedly advised Menke from December 1984 through July 1985 that the Taylor Avenue facilities were entirely unsatisfactory, even on an interim basis. Under these circumstances, no extended review of the application was necessary, and it is hardly surprising that Volvo took little time in deciding to reject Hellmuth's application.

Accordingly, there is no merit to plaintiffs' contention that Volvo breached the VTA.

#### (f)
#### Other claims

As noted herein, the plaintiffs, pursuant to Paragraph 4 of the VTA, released Volvo from any claims asserted in any court arising out of the business relationship which existed between the parties as a result of the May 2, 1977 dealership agreement. On the record here, this Court has concluded that the VTA is a valid enforceable agreement which cannot be set aside because of fraud, duress, failure of consideration or for any other reason. The language of Paragraph 4 clearly bars all of the other

claims asserted by plaintiffs in this suit. There is accordingly no need to engage in a detailed analysis of the other claims included in the complaint.

What is crystal clear from the record here is that Menke brought all of his troubles upon himself. Despite repeated written and verbal admonitions from Volvo, Menke relocated the Car Store's dealership without prior approval into facilities that were less than adequate. Volvo reasonably refused to approve this move, and terminated the dealership. Finding himself in an untenable position caused by his own stubborn refusal to recognize evident facts, Menke bargained for and secured more time so that he might come up with a purchaser. When the expected deal with a prospective purchaser fell through, Menke belatedly found another one. Yet, unaccountably, the new purchaser, Hellmuth, proposed to do the same thing that Volvo had previously rejected, namely locate in unacceptable facilities. Volvo had every right to reject the proposed transfer to Hellmuth and terminate the dealership pursuant to Menke's voluntary, written agreement. All of plaintiffs' claims against defendant Volvo are released by that agreement (the VTA).

Failing all else, Menke filed this suit, contending that for various assorted reasons the VTA should be set aside. None of his asserted grounds for voiding the VTA have merit. Moreover, there are no issues of material fact which would require a trial in this case. Under such circumstances, the entry of summary judgment under Rule 56 in defendant's favor is appropriate.

For all these reasons, defendant's motion for summary judgment will be granted as to all of plaintiffs' claims. An appropriate Order will be entered.